(No. 103529.—)

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. PAUL RUNGE, Appellant.

*Opinion filed May 21, 2009.—Modified upon denial of rehearing September 28, 2009.*

Michael J. Pelletier, State Appellate Defender, Charles M. Schiedel, Deputy Defender, and Steven Clark, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald, Alan J. Spellberg and Jon J. Walters, Assistant State's Attorneys, of counsel), for the People.

JUSTICE KARMEIER delivered the judgment of the court, with opinion.

Chief Justice Fitzgerald and Justices Thomas and Garman concurred in the judgment and opinion.

Justice Burke dissented, with opinion, joined by Justices Freeman and Kilbride.

## OPINION

Defendant, Paul Runge, was indicted in the circuit court of Cook County for the first degree murders of Yolanda Gutierrez and Jessica Muniz. See 720 ILCS 5/9—1(a) (West 1996). The State filed notice of intent to seek the death penalty. A jury subsequently convicted defendant of both murders. Thereafter, the jury found defendant eligible for the death penalty on eight statutory grounds. After considering evidence in aggravation and mitigation, the jury concluded that death was the appropriate sentence. See 720 ILCS 5/9—1(g) (West 1996). The circuit court sentenced defendant to death. Because defendant was sentenced to death, his appeal was brought directly to this court. Ill. Const. 1970, art. VI, §4(b); 134 Ill. 2d R. 603.

On appeal, defendant contends that (1) a biased juror served on his jury, denying him an impartial jury, and the trial court's failure to question other jurors about that juror's activities denied defendant due process; (2) the trial court erred in excluding, as irrelevant, the sexually violent person petition filed against the defendant, as the petition constituted a party admission, and was the basis for a defense argument of judicial estoppel; (3) denying depositions of the prosecution's experts, while allowing depositions of the defense experts, was an unbalanced, unauthorized, and excessive sanction, when defendant, on the advice of counsel from another county, invoked his right to remain silent when examined by the prosecution's expert on the murder charges in this case; (4) the prosecution's closing argument inaccurately denigrated the testimony of two defense experts, based upon misstatements of testimony; (5) the prosecutor improperly asked irrelevant questions concerning victim impact evidence pertinent only to other crimes; (6) the prosecutor's closing sentencing argument improperly relied on irrelevant, extraneous assertions and specious reasoning to defeat mitigation based on the death of defendant's mother; (7) "death is cruel and unusual punishment for crimes committed under the influence of a neuropsychological disorder that may have biological causes, that distorts reality, diminishes impulse control and memory, and for which state legislatures provide for civil commitment and medical treatment"; and (8) the Illinois death penalty statute violates due process under *Apprendi v. New Jersey* because the State is not required to prove beyond a reasonable doubt that, after weighing the factors in aggravation and mitigation, death is the appropriate sentence.

We begin our discussion with a summary of the principal evidence adduced at trial. Facts pertaining to procedural issues will be provided separately in the context of our analyses of those issues.

## BACKGROUND

On the morning of February 3, 1997, a neighbor discovered flames coming from the Chicago apartment occupied by Yolanda Gutierrez and her 10-year-old daughter, Jessica Muniz. When firefighters arrived, they found the bodies of Yolanda and Jessica on a burned bed. John Escamilla, a cause and origin investigator with the Chicago fire department, noted pour patterns, indicating the use of an accelerant on the rug around the bed. He also observed what appeared to be a restraint on Jessica's wrist. In his opinion, the fire resulted from the deliberate act of pouring a liquid accelerant onto the bed and the victims and igniting the accelerant.

Dr. Scott Denton performed autopsies on Yolanda's and Jessica's bodies. Yolanda's body was clad in burned and fragmented clothing, and she had a gaping sharp-force wound to the neck that cut her carotid artery and jugular vein. The wound went deep through the front muscles of the neck, through the large side muscle of the neck, and involved the back of the throat. About half her body had extensive burning and charring. Her vaginal opening was gaping open, which was consistent with a sexual assault. Denton testified that Yolanda died from an incise wound to her neck.

Jessica, like her mother, wore fragmented, burned clothing. She had a gaping sharp-force wound across her neck and was nearly decapitated. Approximately 75% of her body was burned. In addition, on her shoulder Denton noted a stab wound two inches by one inch and one inch deep. During the examination, a tampon, with the plastic applicator still on it, fell from her vagina. Two areas of tearing of her vaginal opening were evident, consistent with sexual assault. In addition, there was redness in the upper and lower parts of her anus, again consistent with sexual assault. At the back of Jessica's throat, Denton noted an area of purple hemorrhage that could have been consistent with the insertion of an adult

penis to the back of her throat. He found pulmonary foam from the lung in her airway and observed that her brain was swollen. The swelling indicated loss of oxygen to the brain, which would take perhaps two minutes to begin swelling. At the time Jessica's throat was slashed her brain was deprived of oxygen. Denton believed it would take approximately three to five minutes of oxygen deprivation for her to die from her injuries or suffer irreversible brain damage.

Solveig Sullivan worked as a forensic scientist for the Illinois State Police (ISP). In February of 1997, he received blood standards and vaginal, oral, and rectal swabs from the bodies of Jessica and Yolanda. Sullivan found no semen on Yolanda's swabs, but a preliminary test indicated blood on her vaginal swab. Blood was indicated on all three of Jessica's swabs and semen was identified on her rectal and oral swabs.

Karla Cluck, a forensic scientist for the ISP, obtained a male DNA profile from Jessica's oral swab and Jessica's DNA profile. Karen Abbinanti, another forensic scientist for the ISP, obtained a DNA profile from a standard taken from defendant and compared it to the male DNA profile from Jessica's oral swab. Abbinanti determined that defendant could not be excluded as the source of the male DNA from Jessica's oral swab. In fact, that DNA profile would be expected to occur in only 1 in 32 trillion Caucasians. Abbinanti concluded that the semen from the oral swab was consistent with having originated from defendant.

Chicago police department Detective Frank Cappitelli received a report from the ISP in September 2000 and met with defendant on June 7, 2001, at the Will County jail. Defendant initially denied any knowledge of the murders; however, when Cappitelli confronted defendant with the ISP crime labs reports, defendant looked at them for a period of time, then said, ''You know I did it,

you got me." Subsequently, Assistant State's Attorney Bob Milan met with defendant and went over the lab report with him. Milan stated that the semen in Jessica's mouth was defendant's, and defendant agreed. Defendant agreed to make a videotaped statement.

In the statement, defendant admitted that, on January 31, 1997, he contacted Yolanda Gutierrez about a Hooked on Phonics program she was advertising for sale. He went to her apartment and discussed the program with her, then said he would discuss it with his wife, and he left. Defendant said he and his wife, Charlene, went to Yolanda's apartment on February 3 to view the program. According to defendant, Charlene argued with Yolanda and grabbed her. Defendant claimed that Yolanda grabbed a knife and told Charlene to leave. He said he grabbed the knife from Yolanda and pushed her to the floor. Defendant stated that he asked Charlene for something to tie up Yolanda, and Charlene brought him duct tape which he used to tie Yolanda's and Jessica's hands. Defendant then put Yolanda and Jessica on the bed. Defendant said he attempted to calm Charlene, then had sex with her on the bed between Yolanda and Jessica. Defendant stated he then pulled down Yolanda's shorts and had vaginal, anal, and oral intercourse with her. Thereafter, he pulled down Jessica's sweatpants and had vaginal, anal, and oral intercourse with her as well. He pulled both their pants up afterward, and proceeded to cut Yolanda's throat with a knife and cut Jessica's neck as well. According to defendant, Charlene came to him with a can of turpentine-like fluid. He ignited the bed with a match, and he and Charlene left.

On June 10, 2001, Cappitelli interviewed defendant's ex-wife, Charlene, regarding her involvement in the murders. Subsequently, Milan and Cappitelli spoke to defendant and advised him of what Charlene had said. Eventually, defendant admitted that he had lied about

Charlene's participation; he admitted she was not present when he committed the crimes.

Defendant then gave a second statement wherein he admitted he went to the Gutierrez apartment alone on February 3, having been there previously on January 31, at which time he discussed the Hooked on Phonics program and observed both Yolanda and Jessica. On the latter date, defendant entered the apartment intending to rape Yolanda, and he had duct tape and a knife in his coat pocket in furtherance of that objective. Once inside the apartment, defendant closed the door, pulled out the knife, and grabbed Yolanda around the front, placing the knife to her throat. Defendant told Yolanda to be quiet and come to the bed and to direct her daughter to do so. Once he had both Yolanda and Jessica on the bed, he taped their hands behind their backs. He said he then had vaginal, anal, and oral intercourse with each of them, as indicated in his initial statement. Although defendant did not recall ejaculating, he admitted he must have. After defendant had intercourse with the little girl, she was bleeding from her vagina. In response, defendant found a tampon and put it in her vagina. He then put Jessica's pants back on. Thereafter, defendant located a can of turpentine or remover and set it by the bed. He then took his knife and cut Yolanda's neck. A gurgling sound came from her neck, and her blood flowed onto the bed. Defendant moved over to Jessica, and cut her neck as well. Again, there was a gurgling sound, and blood sprayed onto the bed. After he had slit their throats, he picked up the can, poured the liquid over them, lit a match, and threw it on the bed. Defendant said he did that to hide the fact that he had slashed their throats. After setting the fire, defendant took the duct tape, the knife, and the can, and he left the apartment. In his videotaped statement, defendant indicated he could help with other unsolved cases.

For purposes of clarification, we note, in passing, that those other unsolved crimes were, like the crimes at issue here, perpetrated between 1994, when defendant was paroled for an earlier offense, and August of 1997, when his parole was revoked and he was again incarcerated. That revocation was the result of an FBI search of defendant's home in March of 1996, a search wherein weapons were found. A petition was eventually filed in 1999 for defendant's civil commitment under the Sexually Violent Persons Commitment Act (725 ILCS 207/1 *et seq.* (West 1998)), and defendant was held in the custody of the Department of Human Services (DHS) during the pendency of that action. That petition was withdrawn when charges were filed in this matter. With those observations, we continue with our recitation of the facts in this case.

Dr. Michael Stone, a clinical psychologist, testified for the defense. Stone indicated that he evaluated defendant on August 29, 2005, after having interviewed him face-to-face for about 90 minutes. Stone diagnosed defendant as a sexual sadist with borderline antisocial personality disorder and narcissistic features. Stone described a sexual sadist as someone who derives sexual pleasure from the fear, pain, and restriction of another. Stone noted there are degrees of sexual sadism corresponding to the person's ability to control violent fantasies and compulsion; not all sexual sadists are criminal and homicidal. Much of a sadist's initial behavior is conscious and deliberate, but as he gets into his particular obsession, it becomes harder to control the situation because it is very emotionally driven and sexually fulfilling to the sadist. According to Stone, defendant demonstrated "minimal ability to control" his behavior. Stone believed that the onset of defendant's sexual sadism occurred at age 17, that his mother's death around that time was traumatic for him and could have affected his ability to

control his sexual sadism—though Stone could not be sure how much defendant's mother's death caused any of his actions—and that his condition worsened over the years, with reduced control over his behavior and increased influence of sexual and violent stimuli.

Specifically, Stone testified that defendant, at the time of the murders, was suffering from a progressive loosening of control and was at risk of impulsively acting out. He stated that defendant lacked the ability to control his behavior. In that regard, Stone expressed the opinion that defendant was insane for purposes of criminal responsibility.

Stone subsequently acknowledged, under cross-examination, how someone acts upon their sexual sadism is a "choice" they make. In defendant's case, he identifies particular types of women, looks for an opportunity, looks for specific vulnerability, and isolates that person and situation. Stone stated that defendant makes "a composite decision" to act or not. Stone acknowledged that defendant would conduct surveillance of a particular woman to determine whether it was feasible to have violent sex with her. Stone noted "it's a combination of the circumstance and the person turning him on, that it being something where he's not likely to get caught and go to jail." Stone could not rule out that defendant's actions included a component of destroying evidence in addition to inflicting pain. He agreed that, as a consequence of earlier offenses perpetrated upon a different victim, who survived, defendant may have learned that allowing a victim to live, after a sexual assault, could result in his arrest and imprisonment. In Stone's words, "That's certainly one take on it, yes."

Stone acknowledged that there were occasions in late 1996 and early 1997 when defendant encountered women, isolated them, intended to act sexually and violently, but chose not to do so because there was a pres-

ence involved that he did not want to deal with. In other instances, defendant had planned, identified women, gathered information, acted upon his intent, and concealed his actions. Stone admitted defendant would be less likely to act if a police officer were present. In Stone's notes, he wrote that defendant said he knew exactly what he was doing and that he was aware of the seriousness of his crimes and took personal responsibility for them.

Dr. Barry Leavitt, a clinical psychologist, was called by the defense to testify. Leavitt did not evaluate defendant for the purpose of establishing whether he had a "mental illness," as defined by Illinois law, or whether defendant was insane. Leavitt had no opinion as to whether defendant was sane or mentally ill at the time of the charged offenses. Instead, Leavitt had evaluated defendant in March of 1999 to determine whether defendant met the statutory criteria for commitment as a sexually violent person under Illinois law. The issues Leavitt was called upon to address in that context were whether defendant had a "mental disorder" which predisposed him to future acts of sexually violent behavior and whether, if he had such a disorder, there was a substantial probability that he would re-offend in the future. Leavitt conducted his evaluation on behalf of the DHS to determine whether defendant would be recommended for civil commitment following his parole. The conclusions of Leavitt's report were in accord with those contained in a report submitted by Dr. Jonas, which was filed in support of a petition for commitment under the Sexually Violent Persons Commitment Act.

Leavitt noted that, in 1987, defendant had lured a 14-year-old girl to his home, while his father and brother were out of town, and had sexually assaulted her. Defendant restrained the girl with handcuffs, used duct tape to cover her eyes and mouth, used a knife, and raped her vaginally, anally, and orally. Defendant claimed it was

consensual, and that he did not threaten, intimidate her, or use violence. In that respect, Leavitt did not believe defendant was being truthful, as there was a marked contrast between the information Leavitt had about the 1987 sex offense and defendant's description of the event. Leavitt said it was common for criminals to minimize their behavior and that is consistent with sanity and with people suffering no mental illness. Based on his examination of defendant and the 1987 incident, Leavitt saw elements of planning and forethought that indicated defendant had a capacity for control. There was an opportunistic quality to the way he carried out the crime. Defendant ran when the police responded to his home, indicating that he knew he had done something wrong. Dr. Leavitt took into consideration Dr. Kaplan's 1987 examination, finding that defendant was able to conform his conduct to the requirements of the law and was sane at the time of that offense. However, Leavitt did suggest the more severe the disorder, the more difficult it might be for a sexual sadist to resist his urges. Leavitt was not aware of any instances when defendant lost control of his sexual urges in public.

Defendant described his upbringing to Leavitt as "essentially normal." Defendant admitted to a fairly early interest in various types of pornography. He described his plan, while incarcerated, to collect virtually every type of pornographic magazine and rent them out to other inmates as a "hustle." Leavitt felt that spoke to defendant's propensity to brag and his capacity to be shrewd, calculating, and manipulative. Although defendant was incarcerated for six years as a result of the 1987 sex offense, he chose not to participate in sex offender counseling.

Leavitt testified that defendant functions, intellectually, within the normal range, with no evidence of mental or cognitive impairment. On the Minnesota Multiphasic

Personality Inventory (MMPI), defendant's answers indicated he was highly self-centered, possessed a strong need for immediate gratification, and lacked insight into his psychological issues. The test also indicated he was likely to be impulsive and would have "potential issues" controlling his behavior; however, Leavitt acknowledged that the MMPI results did not prove that defendant could not control his behavior.

Leavitt diagnosed defendant with sexual sadism and personality disorder not otherwise specified with antisocial and narcissistic features. His diagnosis of sexual sadism was based on defendant's documented history of sexual behavior, particularly the 1987 case. He noted that a diagnosis of sexual sadism does not necessarily mean a person will engage in criminal behavior. When asked if sexual sadism is a serious "mental illness," Leavitt responded that it is a "serious psychological condition." He said it is possible for someone suffering from a severe kind of sexual sadism to be insane or mentally ill, or, on the other hand, to commit a crime and be sane and not mentally ill.

Dr. James Merikangas, a neurologist and psychiatrist, conducted a 90-minute, face-to-face interview with defendant. His notes of the examination do not reflect all the topics they discussed. Merikangas did not talk to defendant about the murders in this case, and he did not videotape the interview. He has personally treated or evaluated approximately six persons with sexual sadism. Merikangas diagnosed defendant with sexual sadism and opined that defendant showed subtle signs of brain damage often associated with sexual sadism. He suggested that one subtle sign of brain damage was the existence of a palmomental reflex on the right side of defendant's lower lip. Merikangas acknowledged a study suggesting that over 10% of normal people have the soft neurological sign of the palmomental reflex, and that the reflex

itself does not support a specific diagnosis. Merikangas also stated that defendant has motor impersistence of the tongue, which Merikangas believed correlates to poor impulse control. Merikangas acknowledged that defendant does not suffer from impulsivity all the time. As part of his evaluation of defendant, Merikangas conducted a partial mental status examination, and concluded that defendant was quite intact and normal.

Merikangas also reviewed CT and MRI scans of defendant's brain. From an MRI scan, Merikangas discerned what he believed were two abnormalities: an enlarged ventricle on the right temporal lobe and enlarged sulci in the right posterior parietal lobe. He opined that the temporal lobe is the structure "most implicated in the scientific studies on sexual sadism." Merikangas described the enlarged sulci as spaces in the brain resulting from atrophic shrinkage. He could not say that such shrinkage had a specific effect, he simply considered it an abnormality. Merikangas further testified there was an enlarged space in the right frontal lobe at the top of the brain, and indicated there were subtle changes that the "average radiologist" would not see as a problem. He acknowledged it is the job of radiologists to look for such abnormalities, that they "perform CT examinations and MRI examinations all day long, all year long," and that they found no abnormalities at all in defendant. Merikangas conceded that nothing on any scans had a direct correlation to behavior in and of itself:

> "PROSECUTOR: In other words, we could have ten people whose MRI looked identical to that [of defendant] and all ten of them could be not criminals or not mentally ill; is that correct?
>
> MERIKANGAS: That's possible, yes.
>
> PROSECUTOR: They could even be from all walks of life, correct?
>
> MERIKANGAS: They could be lawyers."

Merikangas described defendant as being normal 95% of the time, but when his urges built up he would become extremely violent and would rape and murder. Afterward, defendant would be repulsed by the scene and would tend to clean up. On direct examination, Merikangas testified that defendant, during his "frenzy," would have little control and would act on his urges even "if there was someone in the next room, *** without regard for anything else around him." On cross-examination, Merikangas conceded that, to his knowledge, defendant had never committed a sexually sadistic act in the middle of the street, or in a store, or anywhere in public. Merikangas opined that, on the day the crimes were committed, defendant lacked substantial capacity to conform his conduct to the requirements of the law, *i.e.*, he was legally insane. Merikangas stated that defendant does not have to act on his sexual sadism all the time, but sometimes he does. Merikangas testified that the acts of sexual sadism are separate from the concealment of the crime. Merikangas acknowledged that setting the victims' bodies on fire was likely an act of concealment, not part of defendant's sexual sadism. Merikangas testified, "After the sexual sadistic acts he takes measures to prevent being caught. That's self-preservation."

"PROSECUTOR: And obviously killing [the victims] prevents them from testifying against him; is that correct?

\* \* \*

MERIKANGAS: Yes. I mean, they can only testify through the autopsy that was performed and which gave the DNA which allowed him to be captured."

Merikangas doubted that defendant would have committed the acts in this case if a police officer had been present. He acknowledged that he relied upon the findings of Drs. Obolsky and Kaplan, and that Obolsky had found defendant to be sane.

Dr. Park Dietz, a forensic psychiatrist, testified for the prosecution. Among his other credentials, Dietz has

served on two committees involved in rewriting the Diagnostic and Statistical Manual of Mental Disorders (DSM-III and IV). One of his responsibilities was the section pertaining to sexual sadism and sexual masochism.

Dietz examined defendant November 7-9, 2005, from approximately 9 a.m. to 5 p.m. each day. Dietz noted that evaluations of defendant performed in 1987, 1994, 1997, 1998, 1999, and 2000 showed no major depression, no organic brain dysfunction, and no psychosis. Dietz stated those "three things related to mental disease or defect had never been observed." Dietz testified that defendant never had any neurological symptoms other than migraines, he has a normal IQ, has no history of head trauma, never showed abnormalities in mental status examinations, and had normal CT and MRI scans of the brain. In his opinion, there was no brain dysfunction of any significance. Dietz conducted a mental status examination of defendant and found him to be normal.

In his opinion, defendant does not suffer from any mental disease, defect or mental illness. Defendant has sexual and personality problems. Dietz said only a tiny percentage of sexual sadists actually commit crimes against strangers for sexual pleasure. Sexual sadists do whatever they wish about their impulses because their behavior is in their control. "[W]hat is clear is the vast majority of sadists don't commit crimes because they have a conscience, they are law-abiding, they don't want to go to prison, they draw a line somewhere what they are willing to do for the sake of an orgasm."

Speaking to defendant's ability to control his behavior, Dietz observed:

"Mr. Runge told me that he didn't assault the women in *** two cases because of the presence of a baby. And then he said he likes babies and did not want to take the mother away from the baby and knew that if he raped them he would probably kill them.

* * *

That indicates that he is in control of what he is going to do. He already had the intent. He had already picked a target. He had made his plan. And yet something as simple as seeing a baby there allows him to stop himself and leave. That could not occur if he were in some frenzy as he begins to do this.

* * *

He told me the presence of a baby was enough for him to be able to leave. It shows that he can stop. He said that after raping [his first victim, M.V.], figuring out what to do next was the worst of his problems; that is he had no plan for what to do after he was done with the attack. Because he was in prison after the attack on [M.V.] he had a lot of time to think about what happens when you let a torture victim live, you go to prison because they talk.

In 1995, he engaged in two unlawful sexual incidents that involved planning, isolation of victims and concealment. But then for nearly a year and a half he was involved in no known incidents. That year and a half corresponded to the time that he was under surveillance by law enforcement and knew it, which shows that when he knows that law enforcement might be following him, he can avoid having any incidents."

Dietz noted, "None of his unlawful sexual incidents was done in public." In Dietz's opinion, defendant freely chose to commit crimes to fulfill his sexual desires and he killed to conceal his rapes and escape the consequences.

Dr. Helen Mayberg, a clinical neurologist and professor of psychiatry and neurology, testified for the prosecution. In the opinion of Dr. Mayberg, the neurological exam performed by Dr. Merikangas was complete and normal and did not indicate the need for further neurological testing. Merikangas' second report gives an interpretation of behaviors, such as poor planning, as well as poor judgment and impulse control, that were never described as problems in the mental status exam,

which was normal. Mayberg said impulse control problems are pervasive and will not be limited to any particular activity. If a person had a problem with impulsivity, one would expect to see elements of that in the mental status exam. Mayberg noted: "[I]f you really think somebody's got [an] impulse control problem, there are a lot of standardized tests of that part of the frontal lobe to give you quantitative measures that that part of the brain isn't working. Those weren't ordered here, they weren't asked for, they weren't done. And there was a normal mental status exam." Mayberg testified that Merikangas' opinion that defendant had developed an abnormal sex drive was inconsistent with the mental status exam he performed. She stated that sexual sadism is not related to congenital brain abnormality.

Mayberg described defendant's CT and MRI scans as "totally normal." She stated, with respect to the CT scan: "There's no lesions, there's no small frontal lobes, everything is symmetric. The fluid spaces are where they are supposed to be, of the appropriate size. There's no evidence of an old stroke, an old hemorrhage, an old contusion. Like a scar. It's normal, healthy-looking brain." Mayberg had the same opinion after looking at MRI scans, concluding: "[I]t's a normal study." After examining the CT and MRI images in question and comparing them to the conclusions made by Dr. Merikangas, Mayberg concluded that defendant had a normal neurological exam with Merikangas, defendant's MRI images showed no abnormalities of any kind, and there was nothing to support a link between a brain defect and defendant's behavior at the time of the crimes.

Following the presentation of evidence at the guilt/innocence phase of trial, the jury was instructed that it could find defendant not guilty of the murders, not guilty by reason of insanity, guilty but mentally ill, or guilty of the murders. After due deliberation, the jury rejected

verdicts based upon psychological impairment, and found defendant guilty of the first-degree murders of Yolanda Gutierrez and Jessica Muniz.

Thereafter, the jury found defendant eligible for the death penalty on eight statutory grounds: (1) the murdered person, Jessica Muniz, was under 12 years of age and the death resulted from exceptionally brutal and heinous behavior indicative of wanton cruelty; (2) Jessica Muniz was killed during the course of another felony; (3) the murder of Jessica Muniz was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom; (4) the murder of Jessica Muniz was intentional and involved the infliction of torture; (5) the murder of Yolanda Gutierrez was committed in a cold, calculated, and premeditated manner pursuant to a preconceived plan, scheme, or design to take a human life by unlawful means, and the conduct of the defendant created a reasonable expectation that the death of a human being would result therefrom; (6) the murder of Yolanda Gutierrez was intentional and involved the infliction of torture; (7) Yolanda Gutierrez was killed during the course of another felony; and (8) defendant was convicted of murdering two or more persons.

The cause proceeded to the aggravation/mitigation phase of capital sentencing, commencing with evidence of the sexual assaults and murders defendant perpetrated against other victims.

Defendant's first victim, M.V., went to school with defendant and was three years younger. On August 17, 1987, when M.V. was 14 years old, defendant asked her to meet him to help a girl they both knew get marijuana out of her house. Defendant drove her to his house,

motioned her to a room, and struck her over the head, causing her to fall. She was confused and disoriented. Defendant then jumped on her, ripped off her clothes, pinned her arms and put his penis in her mouth. He put a knife to her throat and said, "Don't bite or I'll kill you." He handcuffed her hands behind her back and blindfolded her with a bandana. Defendant moved her to a bed, handcuffed her to it, and repeatedly ground his penis into her mouth as hard as he could. Defendant then stuffed her mouth and put duct tape over it, and bit her vagina and pubic area so hard that she cried. Defendant painfully cut her pubic hair. He penetrated her vagina, twisted her body, and inserted his penis into her backside, all while she was handcuffed to the bed. Defendant removed the gag and repeatedly rammed his penis into her mouth, and threatened her while holding a knife to her throat. He bit her legs and thighs.

Defendant then handcuffed her to a railing in the living room and offered to take her home if she would drink a glass of Seagram's V.O. After M.V. finished most of the glass, defendant took her to the bathroom, where she vomited. He put her in the shower and penetrated her again. M.V. lost consciousness and woke up later with all four limbs cuffed to the bed. She was gagged and, judging from the sunlight, she knew a few hours had passed. Defendant later handcuffed her to a chair and gave her cereal. When she picked up the chair and tried to escape, defendant held a knife to her throat and threatened her. He then cuffed her to the kitchen table, cut her hair with a knife, and began cutting the inside of her arms. Defendant smiled and said he liked it. Defendant bit her nipples so hard that she cried. He told her, "shut up, that doesn't hurt." He then bit her neck, breasts, stomach, crotch, and legs. He penetrated her vaginally, then blindfolded her and put the gag back in. Then he recuffed her hands behind her back, put her face down

92

on the sofa, and penetrated her vaginally from behind. He bit her buttocks, "like wanting to rip off your skin." He squeezed her buttocks, twisted them, spread them apart, and repeatedly rammed his penis into her anus. Defendant then simultaneously penetrated her with a foreign object and his penis, alternating orifices with the object and his penis.

Defendant moved her to another room, removed the gag, and penetrated her orally. M.V. was on the floor with her hands handcuffed behind her back. She recalled: "Every bone in my body hurt." Then she saw defendant grab a fireplace poker, and she related what followed:

"He shoved the handle of the fireplace poker in my anus. He rammed it in as hard as he could. *** [H]e started making it go up and down and over and over and out and in and I felt like my insides were getting ripped out. I kept crying. He kept doing it and doing it. I thought I was going to die because it hurt so bad. He just kept doing it, forcing it in farther and farther and farther."

Defendant stopped when the phone rang. He gagged M.V., bound her ankles, stuck her inside a sleeping bag, and threw her in a crawl space. He told her not to do anything stupid or he would kill her; then he left.

With her hands still cuffed and her legs bound, she rolled and hopped until she eventually got outside. A neighbor who lived across the street saw M.V. with her feet and hands tied. M.V. was crying, shaking, hysterical, and had scarves tied around her mouth.

The police later determined that defendant's father and brother had gone on a trip for the weekend. As a result of the incident, defendant was convicted of aggravated criminal sexual assault, aggravated kidnapping and armed violence, and was subsequently sentenced to 14 years' imprisonment.

With respect to the seven victims who did *not* survive, the State introduced defendant's videotaped statements, along with evidence corroborating those statements.

Defendant's statement regarding the murder of Stacey Frodel was published to the jury. In that statement, defendant related that his wife, Charlene, was a friend of Stacey and she suggested a threesome with Stacey and defendant. In January of 1995, Stacey came over to defendant's house and became drunk. According to defendant, Charlene became mad at Stacey and told defendant to kill her. While Stacey slept, defendant took a weight and hit Stacey on the head. Defendant then put Stacey's body on a plastic sheet and had vaginal sex with her. She was handcuffed. Defendant then had sex with Charlene. After a while, defendant looked over at Stacey and noticed she had not moved and was not breathing. The next day, defendant dismembered Stacey in the bathtub. Using a saw, he cut her hands, ankles, legs, arms, torso, and head, and placed the body parts in garbage bags. Thereafter, he and Charlene borrowed a car and drove toward Wisconsin, scattering body parts as they went.

Corroboration was supplied by physical evidence and witness statements. Recovered bones showed evidence of cutting. Stacey's skull showed evidence of injury consistent with having been struck by a barbell weight. A sample of carpet taken from a bedroom in the townhouse where defendant and Charlene had lived contained traces of Stacey's blood. Dina Bartolini, who lived in that townhouse with defendant and Charlene, said that on January 3, 1995, Charlene indicated she was looking forward to Stacey coming over for a visit. When Stacey came over, they drank, and eventually Charlene told Dina that Stacey would be staying the night. The next day, defendant and Charlene borrowed Dina's car and used more than half a tank of gas. Dina said she had sex four or five times with defendant, including a threesome with Charlene, and including the day that Charlene went to the hospital to give birth.

Defendant's two videotaped statements about the murders of Dzeneta (Janet) and Amela Pasanbegovic were published to the jury. In the second statement, defendant related that, in July of 1995, he told Estella Herrera, a coworker, that his wife was looking for help with her cleaning business. Although Charlene did not have a cleaning business, she eventually spoke to Estella and later told defendant she was going to meet people interested in the job. The real reason for Charlene to meet them was to see if they were willing to have a sexual foursome with Charlene and defendant. Charlene later indicated to defendant that the girls were really attractive.

On July 12, 1995, Charlene brought the Pasanbegovic sisters to the Runge home. When defendant suggested that they submit to sex for money, Janet Pasanbegovic got up and ran upstairs. Defendant caught her outside on the driveway and pulled her down by the hair, her head hitting the concrete driveway. He said he might have hit her again. In any event, Janet was rendered unconscious. Defendant then picked her up and brought her back into the house. When Amela saw Janet, Amela got up. Defendant then dropped Janet on the stairs, grabbed Amela, and took her into the weight room, where he cuffed her to a weight bar. Defendant also put Janet in the weight room. Defendant then went upstairs to see if the police were coming; Charlene went outside and cleaned up the blood outside and on the stairs. Inside, Janet vomited a black liquid. Defendant proceeded to have oral sex with Amela. Thereafter, he went upstairs to see what was going on, and then went back downstairs and had sex with Amela while her hands were cuffed behind her back. Defendant ejaculated on her stomach and wiped it off with her clothing. Amela asked about Janet, and defendant then took Janet and put her in a water-filled bathtub with the shower running. He left

her there. When he later returned, she was under water. He pulled her up and discovered she was not breathing. Defendant informed Amela that her sister had drowned; he then choked Amela until she passed out. Thereafter, defendant dismembered both bodies with a saw and put them into 8 to 10 bags. After he ate dinner, he placed the bags in dumpsters in apartment complexes.

In defendant's first statement to police, he lied about the location of the murders and the dumpsters into which he deposited body parts because the murders took place in Du Page County and Du Page County authorities seemed more intent on pursuing the death penalty.

Estella Herrera worked with the Pasanbegovic sisters before she worked with defendant. She learned that the sisters had been laid off and told defendant about them when he said his wife was looking for people to work for her. Defendant asked if they had family in the area. Estella was subsequently contacted by someone identifying herself as defendant's wife and Estella gave her Amela and Janet's phone number. Later, Estella received a phone call from the same person, who said she had gone to pick up the girls, but they were not there. The woman asked Estella to check and see if there was a problem. A neighbor and former coworker of the sisters, who saw them almost every day, never saw them after July 11, 1995. The sisters had mentioned they had a job offer, from a woman named Lisa (the name used by defendant's wife), who wanted them to stay overnight.

Defendant's videotaped statement regarding the murder of Dorota (Dorothy) Dzibak was introduced as evidence. In the statement, defendant related that his 7-Up route took him along Touhy Avenue in Chicago. On the morning of January 10, 1997, defendant was on Touhy Avenue when he saw a "For Sale By Owner" sign in front of a house. He stopped at the house and knocked on the door. A woman answered whom defendant consid-

ered attractive. Defendant said he was interested in looking at the house and she let him in. Defendant asked to see the furnace, which she indicated was working sporadically, and he pretended to know what was wrong with it. When she came over to look at it, defendant grabbed her by the back of the neck and pushed her to the floor. Defendant told her to be quiet if she wanted to see her daughter. He walked her into the bedroom and made her perform oral sex on him. Then he told her to lie down and had vaginal sex with her. Afterward, he took her to the bathroom and directed her to wash her vaginal area, as he was concerned about the presence of semen. When she came out of the bathroom, he tied her hands behind her back. While she lay face down on a pillow on the bed, he leaned on the high part of her back and neck. When he got off of her, she was not moving or breathing. Defendant grabbed a match and threw it in the closet in an area with paper and clothing. He left after starting the fire.

Physical evidence corroborated aspects of defendant's statement. A heating and air conditioning technician reported the fire around 12:30 p.m. A firefighter, who subsequently entered the house, saw the fire coming from a bedroom closet, removed Dorothy from the bed, and turned her over to other firefighters. In the opinion of a former senior fire marshall, who investigated the scene, the fire was deliberately set and could have been started with a match to a piece of clothing in the closet.

Dr. Scott Denton reviewed the autopsy of Dorothy performed by Dr. Eupil Choi. Dorothy's body showed signs of extensive hemorrhages in the eyes, hemorrhages on the vocal cords and hypopharynx in the neck, and a loose joint in the hyoid bone, which are injuries consistent with manual strangulation. Pressure would have to be applied to the neck for 3½ to 5 minutes to cause death by strangulation. There was no carbon monoxide or soot

in her airways, which is consistent with death occurring before the fire. There were extensive areas of burning to her skin. In the opinion of Dr. Denton, death occurred by strangulation. Photographs of her left and right wrists revealed a red line consistent with some restraint having been placed on her wrists.

Defendant gave a videotaped statement regarding the murder of Kazmiera Paruch. On March 14, 1997, as defendant was driving in the area of 4730 North Kenneth in Chicago, he saw a "For Sale By Owner" sign in front of an apartment or condominium building. Defendant, wearing a 7-Up uniform, stopped and went inside to the unit listed. When a woman answered the door, defendant asked to look at the unit. The woman, Kazmiera Paruch, took defendant through the residence. At some point defendant grabbed her from behind and pulled her on the back of the neck down to the floor. Defendant drove her face into the floor and she bled profusely. Defendant stood her up and walked her to the bathroom. He then pulled off her panties and had vaginal sex with her. He ejaculated on her stomach and wiped it off with a Kleenex. She reached into a cabinet, pulled out an iron, and tried to swing it at him, but he blocked it with his arm and the iron flew toward the toilet. He noticed that her eyes had rolled back in her head and she was not breathing. Defendant said he poured a liquid on her body, lit a match, and left.

A firefighter responding to a reported fire at the residence subsequently found the fire emanating from the bathroom and discovered Kazmiera's body therein. Her lower body was unclothed and an electric cord was across her neck. The firefighter noticed an iron on the bathroom floor.

Carl Hopkins, a fire investigator, responded to the scene and found the severely burned victim with a wire cord wrapped around her neck and a large gash to the

side of her neck. A pair of bloody jeans was on the floor of the bathroom, along with an iron. There was a great deal of blood spatter on the wall. The fire was deliberately set. An empty can of stripper was found on the floor of the closet, just outside the bathroom. A meat cleaver hanging on the wall of the kitchen was smeared with Kazmiera's blood.

Dr. Denton reviewed the autopsy of Kazmiera performed by Dr. Larry Sims. Approximately 70 to 80% of the body was burned. An incise wound and a smaller irregular wound were noted on the right side of Kazmiera's neck. The meat cleaver could have caused those injuries. There were multiple hemorrhages within the neck organs or tissues and the hyoid bone was fractured. Those injuries were consistent with a severe case of strangulation. On the left side of her brain there was a subarachnoid and subdural hemorrhage, as well as some bruising in the deeper brain tissue. Those injuries were consistent with blunt trauma to the head and could be consistent with being struck by an iron.

In addition to the evidence of defendant's seven murders, and eight sexual assaults, the State presented evidence of defendant's escape from DHS custody. On October 6, 2000, Rick Schroeder of DHS was transporting three DHS recipients, including defendant and inmate Conley, from Sheridan Correctional Facility to court in Cook County. Defendant and Conley were restrained with leg shackles and walking restraints. En route, Conley complained that he was sick. Once the vehicle stopped, Conley said "Hey, Rick," and when Schroeder turned around he was sprayed in the face and felt a sharp pain in his eye. He stumbled across the street, and when he regained some degree of vision, he noticed glass on the highway on the passenger side of the van. Defendant and Conley were gone. Schroeder was taken to the hospital and missed work for five weeks.

Sergeant Greg Bell of the Naperville police department received a dispatch about the escape and positioned his patrol car to monitor traffic. He saw a car fitting the description of the vehicle given in the dispatch, followed it, and eventually pulled the car over. The officers drew their weapons and defendant, a female, and a third person were arrested. The woman informed the police there was a gun in the car. The following items were recovered from the car: a Radio Shack plastic bag containing a 9mm pistol, a police scanner, batteries, an Illinois map; a white bag containing a can of pepper spray, two pairs of wrist shackles, and clothing; and a handcuff key and homemade knife. The DHS van had two pairs of unlocked leg shackles and the passenger side window had been completely shattered with an outward motion.

Defendant told police that he and Conley began devising a plan to escape about six months in advance. Defendant had noticed that Illinois Department of Corrections guards no longer accompanied unarmed DHS guards in transporting individuals to and from court. Defendant befriended a DHS guard named Doris Harper. He described their relationship as romantic, but not sexual. Pursuant to the plan, Harper provided two cans of pepper spray inside the facility. Defendant also received a handcuff key from Harper via another DHS guard. Harper purchased clothing for defendant and had $2,000 cash to be used en route to Mexico after the escape. She also arranged for a rental car and was to follow the van to Cook County until the escape. Harper was then to have driven defendant and Conley away. Harper no longer worked at Sheridan by the time of the October escape. Phone records showed multiple calls from Sheridan to Harper's home from July 8 through October 5, 2000. The rear cargo area of Harper's car in Ottawa was loaded with clothing, duffel bags, a .25-caliber handgun, a holster, and ammunition; the car also contained a bolt

cutter and 35 rounds of 9mm ammunition. Inside her home police found a notebook containing step-by-step directions from the Sheridan facility to the courthouse in Chicago.

The State's evidence in aggravation concluded with Ramon Rivera, Yolanda's father and Jessica's grandfather, reading a victim impact statement, in which he described the many positive attributes of Yolanda and Jessica, the loving relationship he had with them, the shock and horror he experienced upon learning of the circumstances of their deaths, and the loss he and his family felt.

In mitigation, Doris Harper testified that the escape from DHS custody was her idea, and defendant told her to pull over when Harper noticed a police vehicle behind them. Under cross-examination, Harper stated that she had become "emotionally attached" to defendant and, "had circumstances been different," would have been "intimate with" him. The plan had been for her and the defendant to escape to Mexico and have a "long term relationship." Harper described defendant as "mannerly," "charming," and "smart." She was equivocal when asked if she had been manipulated, stating: "I really don't know. I can't say either way." She admitted that she gave defendant a handcuff key and mace to facilitate the escape and compiled an array of supplies—including weapons—in furtherance thereof.

Other mitigation the jury heard was based primarily, as had been the insanity defense, upon expert testimony of defendant's deviant sexuality, mental disorders, and the disputed evidence of brain abnormality. Dr. Rabin, a psychologist who had not testified at trial, diagnosed defendant slightly differently than the other experts in that he did not find sufficient evidence to support a diagnosis of sexual sadism. Rabin testified to three psychological tests given to defendant. On a test that

screens for brain damage, he found the results suggested neurological problems, but in the average range. The Rorschach test indicated chronic depression, inferiority feelings, impulsiveness to reduce stress, and a lack of understanding of how others view him. The MMPI tests of self perception indicated that defendant is impulsive, self-centered, uncaring about others, and lacks insight as to his own behavior. Rabin testified that defendant "seems to get along adequately in a male situation, male society." His violence and aggression are "pretty much *** aimed at women." Rabin stated there is no indication that defendant is "any more violent or any more dangerous than anyone else would be who is located within the prison system."

Correctional officers testified that defendant had no infractions of jail rules in four years.

Defendant's adoptive father, Richard Runge, testified on direct examination that he and his wife had adopted defendant as an infant. At age two, defendant lost consciousness briefly after a fall from a grocery cart, but no medical treatment was sought. When he was eight or nine years old, defendant was asked to leave a Catholic school because he was "bothering" girls. At age 11, defendant used a knife to cut up a table and his father's thermal underwear. Defendant told his parents he was "just playing," but they were concerned that he "wasn't conversing *** well" with them, and they sent him to counseling. Defendant was still unresponsive, but thereafter he went to summer camp, and when he returned he "seemed to be fine." At age 14, defendant had sex with two girls his age. He was arrested, as the girls initially claimed they had been attacked, but later, at the police station, the girls said it was consensual, and defendant was allowed to go home. At age 15, defendant had consensual sex with a woman catering a wedding he attended with his parents. Mr. Runge testified that

defendant was emotionally close to his adoptive mother. Defendant, who was then 17 years old, was home with his adoptive mother on the day she died of cancer. He carried her to the car so the attending nurse could drive her to the hospital. Mrs. Runge passed out a short distance from the house and the nurse drove back to the house. Defendant carried her back into the house, called his father to come home, and Mrs. Runge passed away before he could return. Defendant and his younger brother were there. Mr. Runge expressed continuing love for defendant, notwithstanding his actions. He noted that defendant fathered a child with Charlene when he was married to her.

Under cross-examination, Mr. Runge acknowledged that he had never previously told anyone about his son's fall from a grocery cart. He had never sought psychiatric help for his son. He "[d]idn't think he needed it." Mr. Runge testified that girls tended to gravitate to his son; he conceded that defendant could properly be characterized as a manipulative con artist.

After hearing all the testimony in aggravation and mitigation, the jury returned a death penalty verdict.

## ANALYSIS

Defendant first contends that a biased juror (Juror A) served on his jury, denying him an impartial jury, and the trial court's failure to question other jurors about Juror A's activities denied defendant due process.

Trial before a biased tribunal would deprive defendant of a substantial right and constitute structural error requiring reversal. *People v. Rivera*, 227 Ill. 2d 1, 20 (2007), *aff'd*, 556 U.S. 148, 173 L. Ed. 2d 320, 129 S. Ct. 1446 (2009); *Ross v. Oklahoma*, 487 U.S. 81, 85, 101 L. Ed. 2d 80, 88, 108 S. Ct. 2273, 2277 (1988) ("Had [a biased juror] sat on the jury that ultimately sentenced petitioner to death, and had petitioner properly preserved his right to challenge the trial court's failure to remove

[the juror] for cause, the sentence would have to be overturned"). The standard for juror impartiality is whether the jurors had such fixed opinions that they could not judge impartially the guilt of the defendant. *Patton v. Yount*, 467 U.S. 1025, 1035, 81 L. Ed. 2d 847, 856, 104 S. Ct. 2885, 2891 (1984). What is required for purposes of due process is "a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." *Smith v. Phillips*, 455 U.S. 209, 217, 71 L. Ed. 2d 78, 86, 102 S. Ct. 940, 946 (1982).

In the latter respect, questions of possible intra-jury influence or misconduct are treated differently from contamination by external influences. *United States v. Lakhani*, 480 F.3d 171, 184-85 (3d Cir. 2007); *Whitehead v. Cowan*, 263 F.3d 708, 723 (7th Cir. 2001), citing *United States v. Williams-Davis*, 90 F.3d 490, 501 (D.C. Cir. 1996). Thus, the presumption and hearing requirements announced in *Remmer v. United States*, 347 U.S. 227, 229, 98 L. Ed. 654, 656, 74 S. Ct. 450, 451 (1954)—to the extent they survive (compare *People v. Ward*, 371 Ill. App. 3d 382, 402-05 (2007), with *People v. McLaurin*, 382 Ill. App. 3d 644, 651-52 (2008), *appeal allowed*, 229 Ill. 2d 646 (2008) (table))—have been interpreted so as to apply only in situations where "extraneous materials are brought into the jury room" or there is a "third-party contact" with a juror or jurors. See *United States v. Spano*, 421 F.3d 599, 605 (7th Cir. 2005); *Whitehead*, 263 F.3d at 723, 725 (compiling cases); compare *United States v. Vasquez-Ruiz*, 502 F.3d 700, 705, 707 (7th Cir. 2007) (juror found a note in her notebook that could have been "written by an outsider"), with *United States v. Stafford*, 136 F.3d 1109, 1112-13 (7th Cir. 1998) (an internal misconduct or bias case, quoted, approvingly, as follows in *Vasquez-Ruiz*: "Not every allegation of jury misconduct

is sufficiently substantial or sufficiently well substantiated to warrant putting the jurors on the spot in this fashion. \*\*\* Quizzing a juror, or perhaps all the jurors, in the middle of a trial is likely to unsettle the jury, and the judge is not required to do so unless there is a much stronger indication of bias or irregularity than there was here"). Even in situations where some extraneous information *is* brought into the jury room, as in *Spano*, the Seventh Circuit still held that no inquiry of jurors was necessary where the trial judge had observed the jurors carefully and concluded that the likelihood of influence was "too slight to warrant hauling the jurors before him for an examination." *Spano*, 421 F.3d at 605-06 (addressing posttrial interrogation). Indeed, reviewing courts have recognized that "sometimes less is more" when it comes to judicial investigation of alleged juror misconduct; that a trial court, in exercising its investigatory discretion, must assess the particular circumstances before it to ascertain whether questioning individual jurors might compound the problem by drawing attention to it. *United States v. Peterson*, 385 F.3d 127, 135 (2d Cir. 2004); *United States v. Zizzo*, 120 F.3d 1338, 1349 (7th Cir. 1997).

In any case, the question of whether jurors have been influenced and prejudiced to such an extent that they would not, or could not, be fair and impartial involves a determination that must rest in sound judicial discretion. *People v. Whitehead*, 169 Ill. 2d 355, 402 (1996), *overruled in part on other grounds*, *People v. Coleman*, 183 Ill. 2d 366 (1998); *Spano*, 421 F.3d at 605-06; *United States v. Hernandez*, 330 F.3d 964, 990 (7th Cir. 2003) (a trial judge will always be in a better position than a court of review to assess the probable reactions of jurors in a case over which he or she has presided). As the court of appeals noted in *United States v. Dominguez*, 226 F.3d 1235, 1246 (11th Cir. 2000):

"District court judges deal with jurors on a regular basis, and those judges are in the trenches when problems arise. The problems that present themselves are seldom clearly defined and a number of variables have to be considered. There are often no obviously right or wrong answers to the questions that arise. For all of these reasons, a trial judge is vested with broad discretion in responding to an allegation of jury misconduct, and that discretion is at its broadest when the allegation involves internal misconduct such as premature deliberations ***."

As the court of appeals aptly observed in *Dominguez*, "[t]he whole point of discretion is that there is [a] range of options open, which means more than one choice is permissible. The broader the discretion, the greater the range of choice and the less room for reversal." *Dominguez*, 226 F.3d at 1247. The trial judge's discretion clearly extends to the initial decision of whether to interrogate jurors. *Dominguez*, 226 F.3d at 1246. The applicable standard of review, after the trial judge has made an appropriate inquiry, is an abuse of discretion standard, which recognizes that the trial court has wide discretion in deciding how to handle and respond to allegations of juror bias and misconduct that arise during a trial. *United States v. Marti-Lon*, 524 F.3d 295, 300 (1st Cir. 2008). After an inquiry, significant deference must be accorded the judgment of the trial judge on the question of bias because he or she can appraise the jurors face to face (*Marti-Lon*, 524 F.3d at 300), something a court of review obviously cannot do. See also *United States v. Nazzaro*, 889 F.2d 1158, 1167 (1st Cir. 1989) ("the law wisely affords the trier—who is on the front lines, sensitive to the nuances of the case before him—substantial discretion in determining" possible prejudicial influence). That determination requires "an inference, from the facts and circumstances, that a fair trial had or had not been interfered with." *Whitehead*, 169 Ill. 2d at 402. The most controlling facts or circumstances involve the character and nature of the allegedly prejudicial information or

acts. *Whitehead*, 169 Ill. 2d at 402. Each case must be determined on its own facts and circumstances. *Whitehead*, 169 Ill. 2d at 402.

Recognizing that the processes of trial and deliberation take place in the real world, rather than a wholly manageable environment, the Supreme Court has acknowledged that "due process does not require a new trial every time a juror has been placed in a potentially compromising situation. Were that the rule, few trials would be constitutionally acceptable." *Smith*, 455 U.S. at 217, 71 L. Ed. 2d at 86, 102 S. Ct. at 946.

With these principles in mind, we turn to the facts and circumstances of this case, beginning with the *voir dire* of Juror A. During jury selection, Juror A was initially questioned by the trial court, counsel for defendant, and the State.

"THE COURT: [Juror A], as I said in the courtroom, if the Defendant is found guilty of the offenses charged in this case, the State will seek the death penalty in a separate proceeding.

[JUROR A]: Yes.

THE COURT: Along those lines, I want to ask you do you have any scruples, by which I mean strong feelings by reason of religion, morals or conscience against the imposition of the death penalty?

[JUROR A]: No.

THE COURT: Would your beliefs about the death penalty prevent you or substantially impair your ability to reach a fair and impartial decision as to whether the Defendant is guilty?

[JUROR A]: No, sir.

THE COURT: Do you have strong feelings in favor of the death penalty?

[JUROR A]: Not necessarily.

THE COURT: Are your beliefs about that such that regardless of the facts of the case or the background of the Defendant, but if the Defendant were found guilty as charged, you would automatically vote to impose the death penalty and not consider signing a verdict which would result in a sentence of imprisonment?

[JUROR A]: No.

\* \* \*

THE COURT: All right. Also, the defense of insanity may be presented in this case. The law provides a Defendant is not criminally responsible for his conduct if as a result of a mental disease or defect he lacks the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. Do you have any feelings or view points concerning the defense of insanity in a criminal case?

[JUROR A]: No.

THE COURT: If the evidence of insanity were presented, would you consider it together with all the other evidence in the case?

[JUROR A]: Absolutely.

THE COURT: Have you or anyone close to you had any experience with a psychiatrist or a psychologist?

[JUROR A]: Yes.

THE COURT: Tell me briefly and generally what happened and who was involved with that?

[JUROR A]: I've seen psychiatrists before.

THE COURT: Are you still seeing one?

[JUROR A]: No.

THE COURT: How long ago was it you saw one?

[JUROR A]: About three years ago.

THE COURT: Would those experiences in any way affect your ability to consider such testimony of that type of a witness?

[JUROR A]: Not at all.

THE COURT: Mr. Murray [assistant State's Attorney], any questions?

MR. MURRAY: Just regarding the question on the experience with a psychiatrist or psychologist.

MR. MURRAY: That wouldn't cause you, because the testimony is presented on that topic of insanity, that wouldn't cause you automatically to vote against the death penalty, would it?

[JUROR A]: No.

MR. MURRAY: You still would consider that as part of all the testimony presented and weigh it out against everything else?

[JUROR A]: Yes, definitely.

* * *

MR. JORDAN [defense counsel]: Would you consider a person suffering—the fact that a person suffers from a mental illness a mitigating factor?

[JUROR A]: Yes.

MR. JORDAN: Okay. And would you be able to consider that mitigating factor along with any other aggravating or mitigating factors that may be presented to you at the trial?

[JUROR A]: Yes, sir.

MR. JORDAN: Do you think that a person could be guilty but still suffer from a mental illness?

[JUROR A]: Absolutely."

Subsequent questioning by the court revealed that Juror A had a wife and young child, he worked as a drywall finisher, and he had been the victim of a "minor theft." After Juror A was selected as a juror, he approached the court to apprise the court of the financial hardship he would suffer during his service as a juror:

"[JUROR A]: I want to mention that, I mean, you know, this process being what it is, little intimidating, and if I don't go to work, I don't get paid. I'm the only provider in my household. My wife is employed. It is a meager income. Kind of a financial hardship. I know it is [a] civic duty."

The court told Juror A, "there's probably a lot people in your situation," and afforded counsel for both sides the opportunity to question Juror A, an opportunity that both declined. Juror A was sent out of the room and the court asked counsel, "What do you want to do?" Both sides indicated they wanted to keep Juror A on the jury. When the court informed Juror A of the decision, he replied simply, "Okay." The court told Juror A it would inform him when the jury would not convene for full days so he might "sneak in a job here or there." Juror A expressed his appreciation. The court concluded: "We'll do the best we can. We don't want to hold you up any longer than we need to. Thank you for serving, and we'll

see you that next date." Juror A responded, "All right, thank you."

In the course of the first several days of trial, during recesses and adjournments, the court repeatedly instructed the jurors not discuss the case among themselves or with others.

On the fifth day of the nine-day guilt/innocence phase of trial, at the conclusion of the prosecutor's case-in-chief, the court received a communication from Juror B expressing concern over Juror A's behavior. The court had Juror B brought to chambers so that she might air her concerns. At that time, the following colloquy ensued:

"THE COURT: You brought something to my deputy's attention.

[JUROR B]: Yes. My heart's beating so fast. I have a couple concerns over one of the other jurors. Two I might just be hypersensitive about, overreactive, and the other I don't think I am.

The first two occurred on Friday, once toward the end of the case. I can't—I wish I had written it down, but I didn't. The prosecution had made some points, I think this was cross-examination. It was something that the defense was trying to go forward for. The man behind me was like yes. Yes, yeah. Like cheering out loud vocally. I thought it was real—

THE COURT: In the courtroom?

[JUROR B]: In the courtroom. I was aghast. I thought it was horribly inappropriate. I think you had gone back to have a discussion, maybe came back out. I can't remember exactly when it was. It was a monumental point and the prosecution said something. It kind of disproved whatever the defense was trying to push. He was like yes, yeah. I thought it was really inappropriate.

Then when we were back in the room that day, too. We had had like an extra break. He had his cell phone out. Kind of made a beeping noise and he was like oh, check that later. I'm sure that had nothing to do with the case. I'm sure he was checking to see if he had a message from his wife or something like that. But we were told not to use our cell phones.

Maybe I'm being overreactive about those. I just take things really seriously. But this morning, no one's talking about the case. But one of the girls said she's reviewing her notes and she said I don't know if I can ask this question. But does anyone know if that one term was called transferrance [*sic*] like if you touch something. And then someone said yeah, that's what it's called. He said something like yeah, that's what it's called, blah, blah, blah.

Then another girl started talking about the show that she had seen over the weekend. On television. It was about a babysitter that was watching a baby. The baby died. Had gone to court. And I said I think I saw that on 20/20 couple years ago. So bunch of people started chit-chatting about she'd shaken the baby real hard and baby died. Goes on to say but the mother was on cocaine and boyfriend and mother were doing cocaine, blah, blah, blah. She gets done with the story.

And then this man proceeded to say well, as assistant State's Attorney, if that's the wrong term I'm sorry, Milan said the other day in court. He repeated an exact quote that after you had come back here for discussion, you came back out and told us to disregard. I have it. I can tell you what it was, but I crossed it out in my notes.

THE COURT: Okay. I'll ask you to go back to the jury-room, please don't discuss anything about what you said here with anyone.

[JUROR B]: I don't want them to think it was me though."

When the juror exited chambers, defense counsel opined that the jurors were "obviously talking about the facts of the case before defense has even had a chance to present any evidence." Defense counsel asked the court to declare a mistrial. The State responded: "[Juror B] said that people were not discussing the case. Whatever the comment was that the other jurors said yes to was after [a] sidebar, so it was not the comment that was objected to, it was some other piece of testimony." The prosecutor further stated that the discussion about transference did not appear to be "a wholesale discussion of facts and coming to conclusions before the jury's heard

the end of all of the evidence." The prosecutor asked that the court again admonish the jurors not to discuss the case amongst themselves. Defense counsel rejoined: "Obviously we have one juror who if his mind is not made up, is certainly he's already evidencing acute prejudice towards the defense by his comments and by his actions. We would ask that that particular juror *** be excused." The prosecutor stated his belief that a juror "saying yes like that" is not part of a discussion with other jurors and is "not conclusive evidence he's made up his mind." The prosecutor described Juror A's conduct as at most "bad behavior" which did not warrant his removal. The court denied the defense motion for mistrial and stated it would make a determination on the motion to remove Juror A at a later time. The jurors were subsequently admonished not to discuss the case among themselves. Neither Juror A nor any other juror was questioned concerning his or her conduct.

The next day, during a recess in the midst of the presentation of defendant's case, one of defendant's attorneys asked to "speak to an incident that just happened in the jury box." Defense counsel Thompson informed the court:

"[Juror A], the same juror that was complained of by [Juror B], when you overruled the State's last objection and allowed the doctor to answer, he threw the notes he was writing against the wall.

Your Honor, at this time given the display of contempt for the evidence that we're presenting, and to your rulings, along with the complaint of another juror that he is talking about the case, that he is openly cheering in the jury box for the prosecution's case before the end of the evidence, we would again request that he be removed from the jury."

The court thereafter conducted an *in camera* examination of Juror A, as to the note-throwing incident only:

"THE COURT: [Juror A], have a seat. I observed you in the jury box. Are you having difficulty with the case of some kind? What's happening?

JUROR A: Hum. Well, yeah, I have some difficulty, but I have my own opinion and things. And sometimes as a lot of people in there just stated, definitions that we would like to obtain or jot down, there is just no way you're going to be able to write that stuff down in the time we're given, so I set my notepad down and gave up.

THE COURT: Is that why you did that?

JUROR A: Yep, that's why I did that.

THE COURT: Did you formulate any opinions about this case at all, whether or not—

JUROR A: No final opinions because I don't have all the evidence and facts, yet.

THE COURT: I told earlier, at the beginning of the case, the defendant is presumed to be innocent of the charge against him.

JUROR A: Absolutely.

THE COURT: You still understand that?

JUROR A: Yes, I do.

THE COURT: Do you have any problem being able to follow that rule of law basically?

JUROR A: No, sir. No.

THE COURT: Okay. Do you have any opinions as to whether or not the defendant's guilty or innocent of the charge against him at the present time?

JUROR A: Not completely, no.

THE COURT: What do you mean by that?

JUROR A: Well, I don't have all the facts.

THE COURT: Okay. Is there any point, based upon your inability to maybe take notes as fast as maybe you would like to—

JUROR A: It just gets frustrating, your Honor, at some point, trying to ascertain this information and, you know, upon entering the jury room just now, a couple people asked, did anybody get that definition, did anybody get it and we all agreed that a lot of us would like to that [sic] information, but were unable to write it down in time and so, you know, I take that information that I think is pertinent to this investigation and try to keep that for myself to read.

THE COURT: Is there anything about what's happened with the trial so far that would in any way prevent you from giving either side in this case a fair trial.

JUROR A: No.

THE COURT: I'm going to ask you to go back to the jury room. Please don't discuss anything we said back here, as well. Thank you.

JUROR A: Yes, sir."

After Juror A left the room, the court asked: "Anybody want to say anything?" In response, one of defendant's attorneys equated Juror A's conduct to contempt of court and asked that he be excused. Another defense attorney observed:

"[T]his also doesn't answer, you know, the problem that was expressed yesterday, that he is voicing agreement with the prosecution's case, that he is in the back attempting to talk about the case. He has essentially, and given, he has started to form opinions. Now, whether or not there is—I guess there is a philosophical or semantic difference between starting to form opinions and as opposed to having an opinion. But he has essentially started his deliberation process, which he is not supposed to do. Given all of these problems, this will affect the entire deliberation process, his ability to interact with other jurors. And frankly, Judge, although we believe that one can argue that there is a semantic difference, I would argue legally, in fact, there is no difference and he has made up his mind."

The prosecutor responded, "It's not a semantic difference," noting Juror A's explanation that he was frustrated because he could not write down definitions fast enough "so he could be able to read them and use them later on in his deliberations." Moreover, the prosecutor observed: "He said to you that he had not made up his mind. He had not heard all the evidence. That [is] what we ask all jurors to do, to contemplate the evidence and not to make up their minds until they do that." The prosecutor concluded that Juror A was still taking notes on the evidence and should be allowed to continue serving as a juror.

The court decided that Juror A would continue as a juror, stating:

"I take him at his word from what he said right now, the reason why he did what he did is out of frustration. Our reporter asked you to slow down a few times also, Mr. Wolf [defense counsel].

\* \* \*

There is nothing unusual about that and I don't see any reason by what he told me or my inclination that he's not going to be able to give both sides in this case a fair trial. That's all I want. I don't want to do this case over again because of something a juror did or [did] not do properly in the course toward reaching a verdict in this case. So I firmly believe that my decision is the right one here."

Juror A subsequently signed the guilty verdict in this case and the death penalty eligibility verdict.

On the sixth day of death penalty proceedings, before any mitigation had been presented, Juror B sent the judge a note dated February 22, 2006. The note, which purported to recite statements made by Juror A and others, read as follows:

"Afternoon

Every day that we're out there is one more day the Runge [sic] gets to breathe. Has anyone noticed that Runge is the last to get up when they say All rise for the jury—not helping him too much there

Morning

Many comments referring to the immunity of Charlene [Runge] and how fucked up it is—My comment: he was upset. He does not want someone named Lisa [Charlene Runge's alias] calling his house.

Question from other juror—Why didn't you raise your hand when he asked if you read that newspaper that would have gotten you off...

Comment from other juror—You have back ups—there are plenty of backups (jurors).

Maybe I'll get kicked off and use Jay's tickets to Ireland—My comment: a joke.

Many comments about Paul Runge being present during jury selection and knowing his personal information including family information.

Comment from other juror—You should talk to Donna/ Ask Donna these questions."

Juror B was called into chambers and questioned about the note:

"THE COURT: Come in, have a seat. Donna [apparently the bailiff] handed me this note; was that from you?

[JUROR B]: Yes.

THE COURT: Can you tell me about it?

\* \* \*

[JUROR B]: I wrote those remarks that were made yesterday; I labeled them afternoon and morning so that you would know when they were made, and those remarks that were made in the jury room by a juror.

THE COURT: One?

[JUROR B]: One juror.

THE COURT: And that's [Juror A]?

[JUROR B]: Yes.

THE COURT: Okay.

[JUROR B]: It's the same juror as the one that I had spoken to you about before.

THE COURT: Okay.

[JUROR B]: I wasn't sure what the appropriate thing—

THE COURT: You've labeled some things on here 'my comments' or whatever.

[JUROR B]: When I showed it to Donna this morning, she said—well, he was upset, because I wrote, I tried to write it as directly as he stated it, and then I put that was my synopsis comment; that when he made several comments about—can they hear me?

THE COURT: No.

[JUROR B]: —about the immunity of the wife, and that's his language on there; it's not mine. And he was very loud and he was semi-irate. He was definitely, his voice was loud and he was angry. And a lot of the other jurors were all kind of looking at each other, with eyes, like, what should we do, kind of. And I said to the gentleman to my right, I said, 'I'm very uncomfortable with this'.

THE COURT: What's the comment on here from another juror, 'You should talk to Donna or ask Donna these questions'? What's that about?

[JUROR B]: He then was saying his—the basic summary of his comments about the immunity were that, from what I would say, that he was concerned that this woman was just going to show up at his house some day. So I think his anger was kind of from the perspective of a father and a husband, maybe, and he was kind of channeling that.

THE COURT: Who are you saying this about?

[JUROR B]: [Juror A]. Because he was saying, 'I don't want my wife to get a call one day from someone named Lisa.' And he went on to say, he was going on and on about, 'How come Paul Runge was in the room the day that the jurors were selected; he knows who I am; he knows where I live; he knows who the people in my family are.' That's when he asked these questions and then someone said, 'Well, we think maybe he gets a say in who is in on it'; and someone else says, 'Well, he gets a fair trial'; and then another juror said, 'Well, why don't you talk to Donna about this, you know, all these questions.'

THE COURT: Okay. Does anybody want to [discuss] with [Juror B] anything about the—[.]"

At that point, Juror B interrupted, apologizing, apparently, for her syntax, as English was her second language. She then continued:

"I didn't write this, you know, for someone to take a deliberate action. Everyone really likes him. He's a really nice person. He's very witty. He's very clever. He keeps—he kind of keeps the morale going well, so everyone really, really likes him; but my main concerns were that these kinds of comments would come out when the trial is over and the people talk to their family and friends, what were the jurors like. I think if a comment like that came out, like every day that we're in trial is another day that he gets to breathe; I just would have concerns.

THE COURT: Is there anything about whatever he may have said that would prevent you from being able to give Mr. Runge and the State a fair hearing from this point?

[JUROR B]: Absolutely not. No. Then this morning, after I spoke with Donna, because my conclusion this morning was that I would just write these up and show it to Donna and take her advice on what to do; one juror said, 'I wonder if we'll get to see Charlene'; and he said, 'I

wonder if I'll ever get to see her on my front porch.' And then he said—I had just come out of the bathroom and I heard him say something about lyrics, like he was going to write a song or something; then he started singing 'Charlene, you're so mean, something, something about a spleen.' So I think he goes for like a comedy relief or something.

But I just wanted to—I would hate for, after the trial for this to come to your attention and for you to think, why didn't she tell me, if she told me about something earlier in the trial.

THE COURT: I'm going to ask you to go back to the jury room and don't discuss anything we said back here.

[JUROR B]: No. They think that I'm here because I needed a letter for my Thursday night class, but I don't."

After Juror B departed, one of defendant's attorneys stated, "I think we have to talk to the juror in question." Another defense attorney remarked: "My only feeling about that, judge, is I just found his other answer about throwing the notebook completely incredible." The court responded, "We're past that. I remember what happened before. Let's deal with what we have here before us right now." The court decided: "I'm going to bring it in here; I'm going to put it to him, if I'm not satisfied with his answers, I'm going to excuse him and keep him separated from the rest of the jurors until that time, until that decision is made. If I do excuse him, I'll have the deputy go in there with him to get him out of there then."

When Juror A was brought into chambers, the following colloquy ensued:

"THE COURT: How are you doing?

[JUROR A]: Fine.

THE COURT: Sorry we have to bring you back here again. I just wanted to ask you, are you having a rough time with this case at all?

[JUROR A]: I have some issues from time to time.

THE COURT: What about, basically, if you can tell me?

[JUROR A]: Well, if I'm allowed to, yeah.

THE COURT: Yeah, whatever you want.

[JUROR A]: I was uncomfortable with the fact that, you know, Charlene was given immunity, is out there in the

world. I don't know this person, you know. It sounds dangerous to me. I don't like that our names were mentioned on the first day and people know what my family consists of; and I think some information was divulged at that point that was unnecessary. But other than that, no; I really don't have a problem. I mean, the case being what it is, you know, it's kind of rough, yeah, but I'm okay with it.

THE COURT: How about the fact that—is there anything about the type of sentence involved in this case, in other words, you think it should be—we should be done with all this by now; you know what I mean?

[JUROR A]: Well, I don't understand your world, you know. I come from the drywall industry and I'm falling into this thing and I'm starting to realize, I know there is a lot of detail that has to be covered, it feels like it's taking a long time; and it costs me $250 a day, every day I'm sitting here, and it's been a month without a paycheck. I indicated to you on day one that that was going to be kind of a problem with me, but I've come this far so, you know, it seems like it's taking a long time, yeah.

THE COURT: Have you talked about anything, any of these issues, like Charlene, with any of the other jurors or anything like that?

[JUROR A]: I think everybody feels about the same way about that. I think it's a little strange, you know, but it is what it is and it's done.

THE COURT: What do you think about the possible—I mean, do you think that Mr. Runge should be getting the death penalty in this case?

[JUROR A]: I do."

Shortly thereafter, Juror A was taken from chambers and the court asked counsel for comments:

"MR. WOLF [defense counsel]: Judge, at this time it is our position, given his answers, given that this is the same juror who before had started discussing the case, or there were at least allegations, and this is the same juror who threw down his pad—

THE COURT: Get to the point, Mr. Wolf.

MR. WOLF: We would be asking at this point in time to vacate the jury's verdicts finding of guilty, as well as the verdict of eligibility, given that he has—Judge, we're es-

sentially saying he's been dishonest through this entire process. It's not enough to discharge him at this point in time; the jury verdict must be vacated and a mistrial and everything must be declared."

The State responded that neither Juror A's previous comments nor his conduct warranted either vacating the trial verdicts or declaring a mistrial.

The court decided to excuse Juror A and replace him with an alternate. The court denied the defense motions. The judge allowed Wolf's request to speak further, upon the condition that he had something "other than what you've already said." Wolf asked that the court question individual jurors "to find out how long [Juror A's] feelings have been expressed in any appropriate or inappropriate way, so that we can find out if the eligibility verdict has been tainted or the guilt/innocence verdict has been tainted." The court denied that request, noting, "Given the consciousness [sic] of our foreperson bringing this to our attention and her detail as to when this happened, and my other questioning of jurors on other dates, I don't think that is necessary at this time. If I did, I would certainly do that." The court also denied defense counsel's request to inquire if any other jurors had made up their minds on the appropriateness of the death penalty.

When the jury returned to the courtroom, after Juror A had been replaced, the court addressed the jury:

"THE COURT: Ladies and gentlemen of the jury, I just wanted to mention one other thing to you. As I've said earlier in this case, it is essential that you not arrive at any decisions or conclusions of any kind until you have heard all the evidence, the arguments of the attorneys, and the law that applies to this case and have begun your deliberations in the privacy of your jury room.

Are all of you still able to comply with that Court directive that I gave you?

THE JURORS: Yes.

THE COURT: If you are not able to comply with that directive, please raise your hand."

The record indicates that no hands were raised by any members of the jury, and the trial proceeded. An alternate juror subsequently replaced Juror A. The cause proceeded through the presentation of evidence and argument to deliberations on the penalty to be imposed. The jury ultimately concluded that death was the appropriate penalty.

We return to defendant's contention that reversal is required due to Juror A's service on the jury and the trial court's failure to question other jurors about Juror A's activities.

We note, initially, that the pertinent facts and circumstances support the trial court's determination that Juror A be allowed to continue as a juror through the guilt/innocence and eligibility phases of the trial. The trial court, who had the best opportunity to view Juror A's demeanor and assess his credibility, questioned Juror A three times before finally excusing him. The court's observation of Juror A throughout the trial was supplemented by Juror B's reports of his activity.

The court first questioned Juror A in *voir dire*, as did the prosecutor and defense counsel. What emerged from that questioning was Juror A's belief that he could be a fair and impartial juror—notwithstanding his concerns about the projected length of the trial—in that he did not have any strong beliefs for or against the death penalty, he would "absolutely" consider evidence supporting an insanity defense, and he would further consider any mental illness defendant was suffering to be a mitigating factor in sentencing. Juror A acknowledged that he himself had utilized the services of psychiatrists, and those experiences would not affect his ability to consider psychiatric testimony. Obviously, defense counsel's observations of Juror A during *voir dire* led to the conclusion that Juror A could be a fair and impartial juror.

The next time the court questioned Juror A was after the alleged "note-throwing" incident, which occurred subsequent to Juror B's initial report of Juror A "cheering," checking his cell phone, responding to another juror's inquiry about the term, "transference," and responding to yet another juror's story about a television show with a quote from the assistant State's Attorney in this case regarding a matter Juror B said they were instructed to disregard. Although the court did not ask Juror A directly about Juror B's prior accusations—only the first of which would have suggested that Juror A had a biased view of the case—the court *did* inquire of Juror A whether he had formed any opinions, thus touching indirectly on the issue of impartiality. Juror A responded, appropriately, that he had "no final opinions" because he did not have "all the evidence and facts." He stated that he "absolutely" agreed with the proposition that defendant was presumed innocent of the charges against him, and that he had no opinions as to whether defendant was guilty or innocent at that time because, again, he did not have all the facts. He insisted there was nothing that had happened in the course of the trial to prevent him from giving either side a fair trial. Juror A twice explained that he "set [his] notepad down and gave up" because he could not take notes as fast as the defense testimony was coming from the witness stand. He stated there were others in the jury who also had problems keeping up. The court subsequently observed, after Juror A had left the room, that the court reporter had asked defense counsel to slow down as well.

We would observe that Juror A must have realized at that juncture that certain negative answers to the court's questions would likely have gotten him off the jury and returned him to gainful employment if that was his desire. Yet, he did not follow that course. His diligence in trying to take notes during the defendant's case seems to

confirm his response to the court that he had formed "no final opinions." If he had, what would be the point of taking notes? Moreover, there is no reason to believe that Juror A was less than candid in his earlier responses to the court's questions, inasmuch as his candor was evident—admitting that he had formed a premature opinion on the death penalty—when he was questioned during the sentencing phase of trial. Finally, the court had the opportunity to observe Juror A during its guilt-phase questioning and obviously believed he was impartial and qualified to continue as a juror.

Although, after Juror B's final report from the jury room, and the court's subsequent questioning of Juror A, the court later determined that Juror A had by that time inappropriately formed a premature opinion on the suitability of death as punishment in this case, we see in this record insufficient facts and circumstances to overturn the circuit court's assessment that Juror A was qualified to serve as a juror through the guilt/innocence and eligibility phases of the trial. Since Juror A was replaced by an alternate juror at the sentencing phase of the trial, his participation there is not an issue.

We find support for our conclusion in the Eleventh Circuit Court of Appeals' decision in *United States v. Harris*, 908 F.2d 728 (11th Cir. 1990)—quoted approvingly in *Dominguez*—and the Ninth Circuit's disposition in *Davis v. Woodford*, 384 F.3d 628 (9th Cir. 2004).

In *Harris*, the defendants alleged that a juror sitting in the jury box said "do it to him good" as a witness for the prosecution was taking the stand to testify. *Harris*, 908 F.2d at 733. The district court chose not to investigate the remark. *Harris*, 908 F.2d at 734. On appeal, the court of appeals held that the trial court had not abused its discretion in declining to investigate because the meaning of the remark was ambiguous and the district court was in a better position to judge whether the "statement

\*\*\* reflect[ed] serious juror contamination." *Harris*, 908 F.2d at 734.

We believe Juror B's report of Juror A's "cheering" is *at least* as ambiguous, as to intent and context, as the remark attributed to the juror in *Harris*. Significantly, Juror B reported that Juror A was "cheering out loud vocally" when "the prosecution had made some points." If that were true, the parties and the trial judge would have heard it *if they were in the courtroom*. At one point during her report, Juror B told the trial court, "I think you had gone back to have a discussion, maybe came back out. I can't remember exactly when it was." Of course, if the parties and the trial judge were out of the courtroom, the "cheering" could hardly have occurred contemporaneously with "a monumental point" in the prosecution's cross-examination, as Juror B represented. In any event, unlike the district court in *Harris*, the trial court in *this* case *did* subsequently question Juror A to determine whether he could give defendant a fair trial and decide the case solely on the evidence presented. Juror A indicated he could. Juror A in fact stated that he had formed no final opinions because he had not heard all the evidence. The trial judge, who had the advantage of observing Juror A's manner and demeanor during questioning, was satisfied that Juror A could impartially judge defendant's guilt or innocence.

We believe *Davis* also supports the actions taken by the trial judge and our disposition on this issue. In *Davis*, a death penalty case, the trial court received a note from the jury foreman, R.C. Schwartz, before deliberations had begun. The note read in pertinent part:

> "Question One: If we cannot come to unanimous agreement on the penalty phase for the defendant, what will happen next?
>
> Question Two: If we decide on the gas chamber as penalty, is there any reason that we should expect that his punishment will ever actually occur in California?

Three: If we decide on life without parole as penalty and our original verdict of guilty is not overturned, will the defendant actually spend life in prison without parole or can he later be paroled by some higher authority?

Four: Can you describe the impact on the legal system (and taxpayers) which would likely occur for either of the two penalty decisions? In other words, it has been said that the death penalty decision results in millions of dollars of legal expense for the taxpayers of California due to appeals, et cetera. In the end the penalty is not administered.

Five: Can you reassure us that this phase is not just a legal formality and that the result of our deliberation will really have some significance in seeing that justice will prevail?

Six: It is my impression that a death penalty sentence will actually result in life without parole; a life without parole sentence will not stick, i.e., the defendant will later be paroled. Can you comment on this?"

It was not clear whether the note was from Schwartz only or from some larger faction of the jury. Defendant's counsel asked the court to dismiss Schwartz and to inquire whether any of the jurors had discussed the case or the law. The judge denied counsel's request, reasoning that curative instructions would be appropriate. The trial court then instructed the jury in a manner that addressed each of the concerns expressed in the note. *Davis*, 384 F.3d at 652. The trial court did not conduct any individual inquiry of jurors, did not collectively admonish jurors not to discuss the case, and did not inquire whether jurors could still render a verdict based only on the evidence and applicable law. See *Davis*, 384 F.3d at 652-53.

Several months after the trial ended, Schwartz wrote a letter to a newspaper approving of the outcome in the trial. Defendant subsequently alleged that the questions Schwartz submitted to the judge, in combination with his letter, demonstrated a pro death penalty bias. Defendant also contended that the use of the pronoun "we" in the questions raised the inference that the jury

may have discussed the case before submission. Defendant argued that the trial judge should have conducted an inquiry, that the letter established bias, and that the proper remedy was to remand for an evidentiary hearing before the district court or a retrial of the penalty phase. *Davis*, 384 F.3d at 652.

The Ninth Circuit Court of Appeals disagreed. The court of appeals began its analysis by emphasizing that the "Ninth Circuit takes the spectre of jury bias very seriously" and " 'even a single partial juror violates a defendant's constitutional right to fair trial.' " *Davis*, 384 F.3d at 652, quoting in part, *United States v. Angulo*, 4 F.3d 843, 848 (9th Cir. 1993). The court acknowledged that " '[a] court confronted with a colorable claim of juror bias must undertake an investigation of the relevant facts and circumstances.' " *Davis*, 384 F.3d at 652-53, quoting *Dyer v. Calderon*, 151 F.3d 970, 974 (9th Cir. 1998) (*en banc*). However, the court of appeals observed:

> "Were we to assume that premature deliberations occurred, such an exchange, though not necessarily proper, is not as serious as 'private communication, contact, or tampering *** with a juror during a trial [or] *** influence of the press upon the jury,' nor does 'every incident of juror misconduct require[ ] a new trial.' *United States v. Klee*, 494 F.2d 394, 396 (9th Cir. 1974) (internal citations and quotation marks omitted). What is crucial is 'not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury.' *Id.* Although a hearing might have laid to rest any lingering question about premature deliberations or bias, we do not construe the circumstances as mandating a hearing then or now." *Davis*, 384 F.3d at 653.

The court of appeals noted there was no evidence in defendant's case that any of the jurors relied on extrinsic evidence in reaching a death verdict, or that any of the jurors reached a sentencing determination prematurely.

The court observed that defendant was " 'entitled to a fair trial, but not a perfect one, for there are no perfect trials.' " *Davis*, 384 F.3d at 653, quoting *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 553, 78 L. Ed. 2d 663, 669, 104 S. Ct. 845, 848 (1984). The court concluded that the trial court's decision not to hold a hearing on juror bias was not inconsistent with substantial justice, and the district court did not abuse its discretion in denying the request for an evidentiary hearing. *Davis*, 384 F.3d at 653.

As in *Davis*, the trial judge in this case—with even less evidence of juror bias than that extant in *Davis*—took steps appropriate to the circumstances to ensure that no biased juror sat on defendant's jury, that the jury did not reach a verdict prematurely, and that defendant received a fair trial. Specifically, the judge questioned Juror A—the only juror whose impartiality was ever really in question—during the guilt/innocence phase of the proceedings to ensure that Juror A would accord defendant the presumption of innocence, that he could give both sides in this case a fair trial, and that he had not arrived at a premature opinion as to defendant's guilt. Juror A agreed that defendant was "absolutely" presumed innocent, he maintained that he could give both sides a fair trial, and he informed the judge that he had not arrived at an opinion as to defendant's guilt or innocence, as he did not "have all the evidence and facts, yet." The trial judge, who had the opportunity to observe Juror A's demeanor, found Juror A credible. Subsequently, during the aggravation/mitigation phase of sentencing, after Juror A had been exposed to graphic evidence of defendant's other crimes, Juror A had to be excused and replaced with an alternate. However, prior to sentencing, it appears to us that the trial judge acted appropriately and there was no indication of juror bias such that removal of Juror A was warranted at that time.

Although we have already touched upon facts and authorities pertinent to defendant's claims that the impartiality of other jurors was adversely affected by Juror A's conduct or presence, that the trial court erred in not conducting individual questioning of other jurors, and that the possibility of premature discussions of the case might warrant some type of relief, we now turn specifically to those contentions.

In this regard, we note, again, that Juror B appeared to be *extremely* diligent in reporting perceived juror improprieties to the court; yet, her concerns centered only on Juror A's behavior. It is a reasonable inference that she would have reported others had she believed there was a need to do so. The court essentially made that observation when it declined the defendant's request to question jurors individually. We note, in passing, that Juror B's hesitancy to be known to other jurors as an informant did not result in a reluctance to report, in detail, the conduct of others, some of which was collateral to the consideration of this case in any event. For example, when Juror A allegedly repeated a comment of the prosecutor that had been stricken, it was in the context of a juror's discussion about a television show, not this case. We do not consider that a "discussion of the case," nor does it, or a brief conversation concerning clarification of the meaning of the term "transferrance," support the accusation that the jury "discussed the case and evidence throughout the trial." Beyond that, addressing speculative claims that Juror A unduly influenced other jurors, we note that Juror B's second report indicates that other jurors' comments to Juror A—indicating he could get off the jury if he wanted to and that defendant "gets a fair trial"—and their physical reaction to Juror A when he became "semi-irate," suggest that other jurors were not in accord with Juror A's feelings, and that they did not consider his actions appropriate.

Finally, the trial court *did*, of course, conduct an inquiry of Juror B individually, asking her if there was "anything about whatever [Juror A] may have said" that would prevent her from giving both sides a fair trial. She responded, "Absolutely not." The court also questioned remaining jurors collectively, reminding them that they were not to arrive at any decisions or conclusions until they had heard all the evidence, and asking them whether they were "still able to comply with that court directive." They responded affirmatively. Under the circumstances, we cannot say that the trial court erred in not conducting a more extensive inquiry or questioning jurors individually before proceeding. The trial court could have reasonably concluded that extensive questioning of each juror as to premature discussions the jury may have had concerning the case, or his or her interaction with Juror A over the course of this lengthy trial, would have been a substantial and unnecessary distraction from the serious and complex issues that the jury was charged to decide. Pertinent case authority appears to support this conclusion.

As this court observed in *People v. Cloutier*, 178 Ill. 2d 141, 160-61 (1997), quoting from American Jurisprudence:

" 'As a rule, it is improper for jurors to discuss among themselves the case or any subject connected with the trial until all of the evidence has been presented and the case has been submitted to them after final instructions by the trial court. ***

*** Even assuming that discussion by jurors of a case during recesses in the proceedings constitutes juror misconduct, the test for reversibility is whether the misconduct has prejudiced the defendant to the extent that he has been denied a fair trial. The important question in this regard is not whether the jurors kept silent with each other about the case, but whether each juror kept an open mind until the case was submitted to them.' " *Cloutier*, 178 Ill. 2d at 160-61, quoting 75B Am. Jur. 2d *Trial* §1610, at 379-80 (1992).

See also *Davis*, 384 F.3d at 653 ("What is crucial is 'not that jurors keep silent with each other about the case but that each juror keep an open mind until the case has been submitted to the jury' "), quoting *Klee*, 494 F.2d at 396.

Indeed, courts have recognized "[i]t may *** be unrealistic to think that jurors will never comment to each other on any matter related to a trial." *Stockton v. Commonwealth of Virginia*, 852 F.2d 740, 747 (4th Cir. 1988). Even the court of appeals in *United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993), acknowledged, "when there are premature deliberations among jurors with no allegations of external influence on the jury, the proper *process* for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." (Emphasis in original.) Though, as recognized in *Dominguez*, the Third Circuit Court of Appeals has since "retreated somewhat from *Resko*'s stringent standard for investigation into jury misconduct" (*Dominguez*, 226 F.3d at 1248 n.13), limiting the " 'holding [in *Resko*] to the facts of that case, facts which [it] thought—and still think[s]—unlikely to recur' " (*Dominguez*, 226 F.3d at 1248 n.13, quoting *United States v. Bertoli*, 40 F.3d 1384, 1396 (3d Cir. 1994)), *Resko*'s quoted acknowledgment is apt and survives, even as its holding has been limited and restricted to "facts unlikely to recur." Clearly, some indication of occasional and isolated discussions in the jury room prior to submission does not always warrant inquiry or remedial action. In that regard, we find the trial court's action appropriate and sufficient here.

As for the speculative allegation that Juror A's conduct influenced other jurors, we would observe that courts have also tended to minimize the impact that one juror's views may have on others. See *United States v. Yeje-Cabrera*, 430 F.3d 1, 11 (1st Cir. 2005); *United States v. Paneras*, 222 F.3d 406 (7th Cir. 2000).

In *Yeje-Cabrera*, a juror who vocally expressed her views prior to submission of the case was dismissed by the trial court. The jury was thereafter polled *en masse*, but the trial court denied a defense request to interview the remaining jurors individually. On appeal, defendant claimed that the dismissed juror, although removed from the jury, had likely expressed her strongly felt views to the other jurors and thus tainted jury deliberations. *Yeje-Cabrera*, 430 F.3d at 12. In finding that the trial judge acted appropriately, the court of appeals noted that the judge was confronted with ''a difficult situation'' and ''acted well within the range of permissible options.'' *Yeje-Cabrera*, 430 F.3d at 11. As the court of appeals observed, ''Even if the one juror had communicated her views to the other jurors, there is also no reason to think those jurors were dissuaded from following the instructions of the judge, much less that this somehow led jurors to penalize the defendants for their decision not to take the stand.'' *Yeje-Cabrera*, 430 F.3d at 11. In *Yeje-Cabrera*, the court of appeals acknowledged defendant's claim that the court could not ''engage in meaningful appellate review, because the district court's failure to conduct individualized inquiries deprived it and [the court of appeals] of essential information,'' concluding, however: ''Such hyperbole does not win the day.'' *Yeje-Cabrera*, 430 F.3d at 11.

In *Paneras*, the court of appeals considered the impact of a cartoon drawn by a member of the jury. The district court had denied a motion for a new trial based upon the cartoon. As the court of appeals observed, the cartoon ''was a humorous depiction of the defendant's activities as they were described at trial, and it did not make any reference to events that were not part of the evidentiary record nor expose the jury to any new evidence.'' *Paneras*, 222 F.3d at 411. The court of appeals determined it could not conclude that the district court

abused its discretion in denying defendant's motion for a new trial, stating:

"In this situation, it is significant that the cartoon expressed one juror's view of the case, and was subject to the scrutiny and the questioning of other jurors. We also note that the evidence of the defendant's fraud in this case was overwhelming, a factor which militates against a finding that the introduction of the disputed cartoon effected the jury's verdict." *Paneras*, 222 F.3d at 411.

Those observations apply to this case as well. The jurors in this case were instructed, at the outset, to keep "an open mind" until they had "heard everything there is to hear." When asked by the trial judge, upon Juror A's departure, whether they could still abide by that directive, they unanimously stated that they could and would keep open minds until the matter of sentencing was submitted to them. We have no reason to believe that they lied to the trial court when they made that affirmation and, obviously, neither did the judge, who had observed them throughout the trial—a trial in which the evidence amply supported the jury's verdict. In sum, this defendant received "precisely what due process required: a fair trial before an impartial and properly instructed jury, which found him guilty of every element of the charged offense[s]." See *Rivera v. Illinois*, 556 U.S. at 162, 173 L. Ed. 2d at 331-32, 129 S. Ct. at 1456. Given the facts and circumstances of this case, we find no abuse of discretion in the trial court's handling of this matter.

We next consider Runge's contention that "the trial court erred in excluding as irrelevant the sexually violent person (SVP) petition filed against defendant," which he characterizes as "a party admission bearing on his ability to conform his conduct to the law," and his argument that "judicial estoppel and due process preclude prosecutors from presenting evidence that defendant could control his conduct after their earlier contrary position."

Defendant bases his arguments upon an SVP petition filed by the State in 1999, a petition supported by an evaluation performed by Dr. Agnes Jonas, who stated, in part, that defendant is "a compulsive, sexual sadist, who cannot stop his sadistic acts." As a result of the petition, defendant was not released after completing his sentence, but was transferred to DHS custody for treatment. There was a finding of probable cause pursuant to the petition, and defendant was held on the petition until he was indicted in 2001, whereafter the petition was withdrawn. The trial court in this case rejected defense arguments that the petition was a party admission relevant to defendant's mental condition and his ability to control his sexual violence. The court also denied defense motions, based upon principles of judicial estoppel, to bar the State from taking a position at trial that was inconsistent with the position it took during SVP proceedings. During the guilt/innocence phase of the trial, the jury nonetheless learned of the petition as regards experts' consideration of it, and the petition went to the jury during death penalty deliberations.

We begin our discussion of these related issues with a review of principles of judicial estoppel. Judicial estoppel is an equitable doctrine invoked by the court at its discretion. *New Hampshire v. Maine*, 532 U.S. 742, 750, 149 L. Ed. 2d 968, 977-78, 121 S. Ct. 1808, 1815 (2001); *People v. Caballero*, 206 Ill. 2d 65, 81 (2002). As this court stated in *Caballero*, five elements are "generally required" before that discretion comes into play. The party to be estopped must have (1) taken two positions, (2) that are factually inconsistent, (3) in separate judicial or quasi-judicial administrative proceedings, (4) intending for the trier of fact to accept the truth of the facts alleged, and (5) have succeeded in the first proceeding and received some benefit from it. *Caballero*, 206 Ill. 2d at 80.

We find the doctrine of judicial estoppel inapplicable in this instance because any arguable change in the State's position is justified by evidence that came to light after the SVP proceeding was initiated. As the Minnesota Supreme Court recently recognized in *State v. Pendleton*, 706 N.W.2d 500, 507 (Minn. 2005), the justification for the application of judicial estoppel is at best uncertain where a party changes its position after the previous proceedings due to the discovery of new evidence, as parties who change their theories after they discover new evidence bearing upon the issue are not acting in bad faith. *Pendleton*, 706 N.W.2d at 508. "Such changes are consistent with the court's truthfinding role." *Pendleton*, 706 N.W.2d at 508. In such a situation, that party is not playing "fast and loose" with the court, the kind of conduct the doctrine is intended to address. See generally *Caballero*, 206 Ill. 2d at 80.

Here, after the filing of the SVP petition, the State obtained another expert opinion in the form of Dr. Dietz's assessment of defendant, wherein Dietz concluded that defendant could control his actions. Moreover, the circumstances of defendant's seven murders subsequently came to light, demonstrating defendant's capacity for the exercise of judgment and self-control in the selection of his victims and in the time and place chosen for the commission of the offenses. It seems self-evident that a party's position cannot be deemed "factually inconsistent" with a former stance if new facts provide an objective justification for a different position. To hold otherwise would tend to stymie the truthseeking function of legal proceedings. Thus, where as here the discovery of new facts justifies a change in position, and there is no indication of bad faith, judicial estoppel does not apply. We next consider whether the circuit court erred in excluding the SVP petition, which defendant claims was admissible as a "party admission." We note, for purposes

of clarification, that the SVP petition could not be a "judicial admission" because the petition was not a pleading filed in the same court proceeding. See *Green v. Jackson*, 289 Ill. App. 3d 1001, 1008 (1997). Therefore, the question is whether the petition should have been admitted as an "evidentiary admission," which, if admitted into evidence, may be controverted or explained. See *Green*, 289 Ill. App. 3d at 1008.

Even if otherwise admissible, admissions, like any other evidence, are subject to exclusion where jury confusion might result. See generally *People v. Cruz*, 162 Ill. 2d 314, 348 (1994); *United States v. Young*, 248 F.3d 260, 268 (4th Cir. 2001). We certainly see that danger in this case, where the ultimate issues in the SVP proceeding and the subsequent criminal trial were not identical, where the two proceedings presented questions concerning defendant's state of mind at points in time two years apart, and where the expert opinion rendered in support of the SVP petition was formulated without the benefit of the facts surrounding defendant's seven murders. Having made that observation, we see no indication in the record that the circuit court excluded the proffered evidence on that basis. Rather, the court determined the SVP petition was "not an admission by a party opponent." In that regard, we are not prepared to say that the SVP petition was not admissible or that it had no evidentiary value whatsoever; we are, however, convinced that, given its proper weight and impact—and disregarding its very real potential for confusing or misleading the jury—its admission would not have resulted in a different outcome. As we have already mentioned in our discussion of judicial estoppel, and as we will explain more in depth in our analysis of claims of prosecutorial misconduct hereafter, the circumstances of defendant's seven murders, in our view, unequivocally demonstrate defendant's capacity for the exercise of judgment and

self-control. Thus, any error in the exclusion of the SVP petition is harmless beyond a reasonable doubt.

Finally, we will acknowledge and briefly address defendant's summary argument—occupying less than one full page of his brief—that the State's "inconsistent positions" in the SVP proceeding and the subsequent criminal proceeding violate due process of law. In this "argument," defendant cites, but does not discuss, the Supreme Court's abbreviated, *per curiam* decision in *Green v. Georgia*, 442 U.S. 95, 60 L. Ed. 2d 738, 99 S. Ct. 2150 (1979), and the Court's more recent decision in *Bradshaw v. Stumpf*, 545 U.S. 175, 162 L. Ed. 2d 143, 125 S. Ct. 2398 (2005). We note that the former decision does not discuss or explicitly address the consequences of a prosecuting authority taking inconsistent positions in different proceedings. In the latter case the Supreme Court found that the Court of Appeals was "wrong to hold that prosecutorial inconsistencies between the Stumpf and Wesley cases required voiding of Stumpf's guilty plea," and the Court failed to reach, and thus "express[ed] no opinion" with respect to, the question of whether the State's "allegedly inconsistent theories" constituted a due process violation at sentencing. See *Stumpf*, 545 U.S. at 186-87, 162 L. Ed. 2d at 156, 125 S. Ct. at 2407-08. Defendant fails to explain how *Green* or *Stumpf* would justify our finding a due process violation in his case. Similarly, defendant cites our opinion in *Caballero*, but he provides no meaningful discussion of the facts of that case or the principles expressed therein. He makes no attempt to compare the facts of *Caballero* to his own circumstances. In short, defendant fails to demonstrate how his due process rights were violated and we see no basis for such a finding.

Defendant next contends that "denying depositions of the prosecution's experts, while allowing depositions of the defense experts, was an unbalanced, unauthorized,

excessive sanction, when defendant, on the advice of counsel from another county, invoked his right to remain silent when examined by the prosecution's psychiatric expert on the pending murder charges in the other county." This issue arises from defendant's refusal—apparently upon the advice of counsel representing defendant in Du Page County on the Pasanbegovic murder charges—to speak to Dr. Dietz regarding the Pasanbegovic murders. Defendant did speak to his own expert, Dr. Merikangas, about the murders, and one could assume that he spoke with another defense expert, Dr. Stone, because Stone joined in Merikangas' conclusions, which explicitly cited the Du Page County homicides.

In response to defendant's refusal, the trial court allowed prosecutors to depose defense experts with respect to the Pasanbegovic murders. Defense attorneys were not allowed to depose prosecution experts. Defendant argues that the sanction of allowing depositions is not authorized by section 115—6 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—6 (West 2006))—though depositions are allowed in capital cases pursuant to Supreme Court Rule 416(e) (188 Ill. 2d R. 416(e))—because section 115—6 does not explicitly provide that depositions may be employed as a sanction. Section 115—6 specifically provides that any statements a defendant makes to an examining expert shall be admissible against him only if he raises the defenses of insanity or drugged condition, and in that case they are admissible "only on the issue of whether he was insane or drugged." 725 ILCS 5/115—6 (West 2006). As far as refusal is concerned, the statute provides:

"The refusal of the defendant to cooperate in such examinations shall not automatically preclude the raising of the aforesaid defenses but shall preclude the defendant from offering expert evidence or testimony tending to support the defenses if the expert evidence or testimony is based upon the expert's examination of the defendant. If

the Court, after a hearing, determines to its satisfaction that the defendant's refusal to cooperate was unreasonable it may, in its sound discretion, bar any or all evidence upon the defense asserted." 725 ILCS 5/115—6 (West 2006). Defendant asserts that the statute does not give the court discretion to "improvise" other sanctions for a lack of cooperation. Defendant contends, "[t]he statute only allows the court to bar the entire affirmative defense, or alternatively to bar any evidence upon the defense asserted." Defendant suggests that the "fair, balanced, and authorized sanction for defendant's minor lack of cooperation in relation to the Du Page County case would have been to bar defense expert testimony relying on the Du Page County murders based solely on what defendant told the experts about them, while allowing Dr. Dietz to rely on the facts of those murders, which were known from defendant's confessions and his wife's account of the murders." Defendant opines that he was prejudiced by the depositions insofar as the "State learned what the defendant's experts would say, how they would say it, and what their courtroom demeanor would be." In contrast, "the defense had little or no advanced knowledge of Dr. Dietz's testimony or demeanor."

The State complains that defendant's refusal to cooperate was unreasonable and the sanction of depositions as a response thereto should be considered in conjunction with "the defense experts' skimpy and tardy compliance with discovery." Noting that the trial court is empowered to order depositions pursuant to Rule 416(e), the State argues: "It cannot be the case that the trial court has this power except when the defendant unreasonably refuses to cooperate with discovery." Quoting in part from section 115—6, the State points out that the trial could have barred "any and all" evidence on defendant's defense, but chose a less severe "sanction."

We find it unnecessary to decide whether the ordering of depositions was an appropriate "sanction" in this

context. It is our prerogative to forgo the determination of issues unnecessary to the outcome of a case (*DeLuna v. Burciaga*, 223 Ill. 2d 49, 83 (2006)), and that principle is no less applicable in capital cases where any conceivable error would be harmless (*People v. Mertz*, 218 Ill. 2d 1, 73 (2005)). That is certainly the case here.

While defendant may be dismayed that the "State learned what the defendant's experts would say, how they would say it, and what their courtroom demeanor would be," and he suggests that "the defense had little or no advanced knowledge of Dr. Dietz's testimony or demeanor," the truth of the matter is that any asymmetry in the discovery procedure was occasioned by defendant's unreasonable behavior, and the parties were, in any event, subject to certain basic obligations of disclosure in discovery, so there was little chance that either side would be surprised by the position taken by the other's experts.

As this court stated in *People v. Pasch*, 152 Ill. 2d 133, 181-82 (1992), the Supreme Court's decision in *Wardius v. Oregon*, 412 U.S. 470, 37 L. Ed. 2d 82, 93 S. Ct. 2208 (1973) (cited here by defendant), does not require discovery to be perfectly symmetrical. Nor does *Wardius* require reversal unless there is a substantial probability that the alleged error "may have infected the verdict." *Wardius*, 412 U.S. at 479, 37 L. Ed. 2d at 90, 93 S. Ct. at 2214. We see no chance of that in this case. We do not reverse judgments upon pure speculation. See *People v. Redd*, 173 Ill. 2d 1, 39-41 (1996) (defendant's contention that a different result "probably" would have obtained had the court allowed standby counsel to cross-examine a witness was "purely speculative"). We are confident that familiarity with the nuances of the witness' manner of testifying in this case would not have changed the outcome given the strength of the State's case.

We next consider defendant's various allegations of prosecutorial overreaching. Defendant contends that reversal is required because (1) the prosecution's closing argument at the guilt/innocence phase of trial "inaccurately denigrated two key defense experts, based upon misstatements of testimony as to Dr. Stone's credentials and Dr. Merikangas' alleged mistake in reading a brain scan; (2) "questions on irrelevant victim impact evidence for other crimes were erroneously asked by the prosecutors in aggravation"; and (3) "prosecution sentencing arguments improperly relied on irrelevant, extraneous assertions and specious reasoning to defeat mitigation based on the death of defendant's mother."

The first of defendant's three arguments is founded upon two prosecutorial statements in closing argument. In the first, the prosecutor said that Dr. Stone "didn't seem fit to the challenge," that "some of his accreditations were mail-ins. He mailed in a form and got a diploma." The prosecutor's comments in closing were based upon a brief exchange with Dr. Stone in which the prosecutor asked Stone about his certification for the Association of Forensic Testing. Stone replied: "Involves credential review to a committee, related experience and then mandatory continuing education. And I was grandfathered in so in my case there was no actual exam, which there is today." The prosecutor asked if he had to appear in front of a board or respond to peer questioning. Stone said that would be required if there were "any questions on the application" or if "the letters of reference don't check out," otherwise "there's no actual face-to-face review with a committee." The prosecutor stated: "So it's—basically it's a mail-in type of situation." Stone replied: "Well again you mail in your application, credential review, right."

The second component of defendant's first argument concerns another brief comment the prosecutor made in

rebuttal argument concerning the earlier testimony of Dr. Mayberg. Mayberg had initially testified that Merikangas had circled the *left* parietal lobe of defendant's brain on the brain scan at issue, when Merikangas' testimony and report referred to the *right* parietal lobe. Almost immediately after making that mistake, Mayberg stated: "I stand corrected. This is right 1.0. Sorry, we are looking at two different images here. He has circled right. We are looking at right." Later, in rebuttal argument, speaking of Dr. Merikangas' evaluation of defendant's brain scan, the prosecutor stated:

> "He criticized professionals at Rush and says he can see more than they can, but yet, when you hear testimony, marking up exhibits, remember it was the right parietal part of the brain, the right side of the brain. Well, Dr. Mayberg testified that he, Dr. Merikangas, had circled the left side."

The defense objected, and the court overruled the objection, stating, "the jury has heard the evidence in this case." Before moving on, the prosecutor asked, "How do you make that mistake?"

The second of defendant's three arguments is that the prosecutor, in the aggravation/mitigation phase of trial, asked improper questions concerning irrelevant victim impact evidence pertaining to other crimes committed by defendant. As defendant notes, this court, in *People v. Hope*, 184 Ill. 2d 39, 52 (1998), held that "the unforeseen effects of \*\*\* prior crimes on their victims are of no such assistance" in the capital sentencing process, as they are "simply too attenuated to be relevant." The improprieties alleged here concern two questions posed to witnesses, neither of which was ever answered, and a brief statement by the prosecutor in an otherwise lengthy argument.

At the conclusion of the testimony of M.V., the first aggravation witness, the prosecutor asked M.V. to describe how defendant's assault and torture of her still

impacted her life. An objection was overruled, but immediately thereafter the prosecutor concluded her questioning and the question was never answered.

Another witness, Mensur Pasanbegovic, the father of the sisters who were murdered, testified regarding the circumstances of their disappearance. Before concluding the questioning of Pasanbegovic, the prosecutor asked whether Pasanbegovic had "erected a memorial in Sarejevo." That question was cut off by an objection, which the court sustained. No other question was asked along that line.

During closing argument, the prosecutor made the following remarks concerning M.V.'s experience:

> "You want to talk about a natural life sentence. Take the victim's point of view. That 32 year old woman, when she testified up here, she was fourteen years old again. She was fourteen years old when she testified to you. She relived the horror of that night for you. And when she reflects back to that point in her life, when she was caused to think back on it, she sees the face of Paul Runge. She relives that horrific night, and what happened to her. She has been sentenced by Paul Runge to natural life."

An objection was overruled.

The third and final contention of prosecutorial overreaching concerns the prosecutor's argument at sentencing that defendant's mother's death was not related to his assault upon M.V. The prosecutor observed that other young people lose parents and do not commit crimes as a result of their loss. The prosecutor argued: "There is no connection whatsoever between his mother's death and his actions and his crimes. There is a connection between his dad and his brother going away and leaving him behind." After defense counsel acknowledged that defendant had had prior police contact before the offense against M.V., counsel stated: "His mother dies in his arms of cancer from a long debilitating disease. The first time his father and brother go out of town, he kidnaps and

rapes [M.V.]. That's what the empirical evidence is." The prosecutor subsequently responded:

"How many thousands, how many hundreds of thousands of children suffer the loss of a parent every year. With Paul Runge, he would have you believe within two weeks or maybe three weeks *** he went from the grieving over the loss of his mother to the horrific assault on [M.V.]

\* \* \*

This was just the opportunity when his father, or no parental supervision was in the house. Yes, it is very sad when a parent dies at an early age. But the logic to equate that with why he is the way he is is fractured."

At that point an objection was overruled. The prosecutor then stated: Now, maybe we should muster all the FBI agents we can find and all the police officers and head over to all the orphanages." An objection to that statement was sustained, and the prosecutor was directed to "refer to this case only."

We note that prosecutors are generally accorded wide latitude in the content of their closing arguments. *People v. Perry*, 224 Ill. 2d 312, 347 (2007); *People v. Evans*, 209 Ill. 2d 194, 225 (2004). They may comment on the evidence and on any fair and reasonable inference the evidence may yield. *Perry*, 224 Ill. 2d at 347. Reviewing courts will consider the closing argument as a whole, rather than focusing on selected phrases or remarks, and will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error. *Perry*, 224 Ill. 2d at 347; *Evans*, 209 Ill. 2d at 225. The complained-of questions and remarks in this case fall far short of that standard.

All of the comments were brief and isolated in the context of lengthy closing arguments, a factor we have found significant in assessing the impact of such remarks on a jury verdict. See *People v. Harris*, 225 Ill. 2d 1, 33 (2007); *People v. Caffey*, 205 Ill. 2d 52, 105 (2001).

Moreover, objections were sustained in two instances, and the jury was subsequently instructed that it should disregard such questions and comments, as well as any arguments not supported by the evidence. Those considerations are also appropriate factors in our assessment. *People v. Bannister*, 232 Ill. 2d 52, 91 (2008) ("improper inferences from the prosecutor's comments were cured by the trial court sustaining defense counsel's objections and the court's instructions to the jury to disregard comments to which objections were sustained"); *Harris*, 225 Ill. 2d at 33 (in considering the possibility of prejudice this court noted that "defense counsel's objection to the comments was sustained and the jury was properly instructed that the arguments of counsel were not evidence that it could consider").

Addressing defendant's arguments in the order we have presented them, we note, first, that Dr. Stone's certification for the Association of Forensic Testing was, essentially, a "mail-in" accreditation, as the prosecutor characterized it; Stone did not have to take an exam and he did not have to appear before a panel of his peers. Stone admitted as much. When the prosecutor, referring to the accreditation procedure, stated, "basically it's a mail-in type of situation," Stone replied: "Well again you mail in your application, credential review, right." Whether that characterization of Stone's credentials "denigrated" Stone's qualifications was a matter for the jury to decide. However, one way or the other, we do not believe that it played a significant part in the jury's assessment of his testimony, and that it is far more likely that the jury judged the credibility of Stone's testimony by considering it against the conflicting backdrop of defendant's conduct—conduct evincing an ability to control his behavior when circumstances dictated that he do so. *Cf. People v. Urdiales*, 225 Ill. 2d 354, 434 (2007) ("the attendant facts and circumstances of defendant's

crimes are themselves a compelling refutation of testimony given by the defense experts'').

The same is true of Merikangas' testimony. The jury heard Dr. Mayberg correct herself, stating that Dr. Merikangas had indeed circled the right side of defendant's brain on the brain scan. We are confident that the jury judged Merikangas' testimony on its merits, or lack thereof, not the prosecutor's brief and isolated remark.

With respect to defendant's second argument—regarding improper victim impact evidence—we note that the question asked of M.V. was never even answered, and an objection was sustained when the prosecutor asked Pasanbegovic about a memorial to his daughters in Sarejevo. The prosecutor's brief comments about M.V.'s testimony appear to be an attempt to elicit sympathy for M.V. by describing the impact defendant's assault has had on her years after the incident. In that respect, the comments were improper pursuant to the reasoning espoused in *Hope*; however, we find they did not affect the overall fairness of the sentencing hearing. Our review of other cases supports that finding.

In *People v. Kokoraleis*, 132 Ill. 2d 235, 285 (1989), the prosecutor commented on the victims' rights to get married, have families, have children, and spend time with their families. Although this court found that the prosecutor's comments were improper, the court concluded that the remarks did not affect ''the overall fairness of the sentencing hearing.'' *Kokoraleis*, 132 Ill. 2d at 285. This court reached the same conclusion in *People v. Emerson*, 189 Ill. 2d 436, 508-10 (2000), where the prosecutor argued:

> "Her name was Delinda Byrd. Delinda Byrd, a victim in this case. She had a life. She had hopes. She had dreams. They were taken away from her by Dennis Emerson. They were taken away from her only because he cared about nothing. Nothing, but himself. The last moments of her life were spent struggling for breath while 90 percent of

her skin was being burned. Imagine her terror. Imagine her fear. \*\*\*

\*\*\* This is the defendant that did that to her, that turned her into a corpse, who took away all her hopes and dreams and took away all of what she could contribute to society and to the community, and all of what she could contribute to everyone that knew her and enriched their lives."

In *Urdiales*, a case that has remarkable similarities to this case—the jury heard the testimony of Dietz and Merikangas, as well as the details of defendant's multiple murders and the graphic testimony of a lone surviving victim—the prosecutor referred to the families the victim left behind and speculated about "how many children and grandchildren will not be born because of the actions of the defendant." *Urdiales*, 225 Ill. 2d at 447. We found that the prosecutor's "brief and isolated comments, while improper, were not so prejudicial as to deprive the defendant of a fair sentencing hearing or change the outcome of the proceeding." *Urdiales*, 225 Ill. 2d at 448. We so find in this case.

Finally, we believe it was proper for the prosecutor to note that thousands of children lose parents every year and do not embark upon a life of crime as a result, and to suggest that defendant committed the assault against M.V., not because of his mother's death, but due to the opportunity furnished him when his father and brother went out of town, leaving the house to defendant. We note, initially, that Dr. Stone did not testify with certainty that the death of defendant's mother affected defendant's ability to control his sexual sadism; rather, he testified on direct examination that it was "possible." He admitted he could not be sure how much defendant's mother's death caused any of his actions. Dr. Leavitt testified that he did not find anything in defendant's early history or background information to be clinically significant. Merikangas testified that defendant was attached to his

mother. Though Dietz acknowledged that the loss of one's mother would be a stressor for anyone, he observed that reports indicated defendant was fine thereafter:

"[N]o one reports his having had any unusual response to his mother's death. His father told a social worker that Mr. Runge seemed upset for about two weeks and was then fine. And it seems to me that a more significant issue was it was the first time that he had the whole house alone to do this in."

There was in this instance no unequivocal testimony or evidence that the death of defendant's mother affected his ability to control his sexual sadism. There was at most speculation. On the other hand, there was also testimony suggesting that the loss of defendant's mother was *not* a significant factor in the sexual assault and torture of M.V.

As this court has observed, a prosecutor may comment on the facts and legitimate inferences that may be drawn therefrom. *People v. Enis*, 163 Ill. 2d 367, 407 (1994). It has been held that prosecutors may discuss subjects of common experience or common sense in closing argument as well. See *People v. Beard*, 356 Ill. App. 3d 236, 242 (2005). Indeed, since this court has acknowledged that jurors do not leave their common sense behind when they enter court (*People v. Steidl*, 142 Ill. 2d 204, 238 (1991)), it would seem proper for prosecutors to couch arguments in those terms and make appeals thereto.

That is what the prosecutor did in this case, arguing that criminal activity is not a normal consequence of the loss of one's mother and that a more reasonable explanation for defendant's assault on M.V. was, as Dietz suggested, the opportunity furnished when defendant's father and brother went out of town, leaving him alone in the house.

In sum, we find that the prosecutorial conduct of which the defendant complains was either proper or was

cured by the sustaining of objections and appropriate instructions to the jury. Moreover, any error was undoubtedly harmless given the brief and isolated comments and the strength of the State's case.

In the latter regard, the evidence adduced at the guilt/innocence phase was, in our opinion, wholly inconsistent with defendant's claims that he could not control his behavior or that his judgment was impaired. The evidence in fact showed that defendant, in pursuit of sexual gratification, exercised judgment and self-control in the selection of his victims and in the time and place chosen for the commission of the offenses. He did not commit offenses in public. He was able to refrain from criminal conduct during an extended period in which he knew he was under surveillance. He obviously would not have committed the crimes if police had been present. His actions showed planning and organization in that he brought supplies with him to carry out the crimes. He killed his victims after the sexual assaults so they would not be around to testify against him. We cannot help but notice the similarities to the defenses advanced and rejected in *People v. Urdiales*, 225 Ill. 2d 354 (2007). They were properly rejected here as well. The evidence overwhelmingly supported defendant's guilt and the jury's verdict.

With respect to the jury's final verdict, finding death to be the appropriate sentence, we again conclude that prosecutorial error could not have affected the outcome. As we have heretofore chronicled, the evidence in aggravation was overwhelming. The lone survivor of an assault by defendant testified extensively and graphically to the torture—mental and physical—that defendant inflicted upon her. Defendant's summary accounts of the sexual assaults and murders of seven other victims were admitted as evidence. Although defendant, in mitigation, supplemented his psychological evidence from the guilt/

innocence phase with the testimony of Dr. Rabin, that testimony added little to the evidence previously presented by defendant and rejected by the jury. Doris Harper's testimony, in which she attempted to take the blame for planning and helping to execute defendant's escape from DHS custody, was transparent, and it did little or nothing to help defendant. Instead, it merely underscored his ability to manipulate others. The testimony of correctional officers, that defendant had no infractions of jail rules in four years, is not particularly significant, because, as we noted in *People v. Thompson*, 222 Ill. 2d 1, 44 (2006), a defendant awaiting trial for a capital crime has every incentive to behave flawlessly while incarcerated. Finally, the testimony of defendant's father was what one might expect from a parent asking a sentencing jury to spare his son. Mr. Runge's testimony *did* raise the possibility that defendant suffered brain trauma early in life—something that he had never reported to anyone before; however, Mr. Runge's actions for the many years after the incident to which he testified do not indicate any concern over defendant's mental condition, other than during a brief period in adolescence. Mr. Runge acknowledged that his son could be properly characterized as a manipulative con artist. Irrespective of any minor prosecutorial transgressions, we are confident the verdicts would not have been otherwise.

Defendant next argues that "death is cruel and unusual punishment for crimes committed under the influence of a neuropsychological disorder that may have biologic causes, that distorts reality, diminishes impulse control and memory, and for which state legislatures provide for civil commitment and medical treatment." In support of this argument, defendant notes that the Supreme Court has held the eighth and fourteenth amendments forbid imposition of the death penalty on offenders who were under 18 years of age when their

crimes were committed (*Roper v. Simmons*, 543 U.S. 551, 161 L. Ed. 2d 1, 125 S. Ct. 1183 (2005)) and the eighth amendment prohibits imposition of the death penalty on mentally retarded offenders (*Atkins v. Virginia*, 536 U.S. 304, 153 L. Ed. 2d 335, 122 S. Ct. 2242 (2002)). Defendant posits that:

> "The death penalty is cruel and unusual punishment inconsistent with evolving standards of decency in light of the progress that medical science is making in understanding sexual sadism. Murders influenced by sexual sadism are less culpable than murders committed by normal adults motivated by greed or anger. Punishment for such offenders should allow for rehabilitation potential with the aid of medical treatment and exclude punishment by death."

We note that defendant is neither under the age of 18 nor mentally retarded. He is not "guilty but mentally ill" as that term is used in subsections (c) and (d) of section 6—2 of the Criminal Code of 1961 (720 ILCS 5/6—2(c), (d) (West 1996)). Even if he were, as this court held in *People v. Crews*, 122 Ill. 2d 266, 280-81 (1988), that would not preclude imposition of the death penalty. This court recently affirmed that principle in *People v. Manning*, 227 Ill. 2d 403, 413 (2008). In *Urdiales*, we affirmed a death sentence under facts very similar to those in this case.

In any event, as we have noted, the evidence adduced at trial overwhelmingly established that this defendant could control his behavior when it suited his purposes, and the judgment he exercised in the planning and commission of these offenses showed no signs of impairment. These were premeditated acts. Defendant would have us believe that the murders he committed after these sexual assaults were somehow different and "less culpable" than the murders committed by other criminals. We fail to see the difference between this defendant and any other who kills his victim in order to prevent the victim from testifying against him. We adhere to our prior holdings, and we find, under the circumstances of this case,

that the death penalty is not cruel and unusual punishment with respect to this defendant.

Finally, we acknowledge defendant's argument that the Illinois death penalty statute violates due process under *Apprendi v. New Jersey* because the State is not required to prove beyond a reasonable doubt that, after weighing the factors in aggravation and mitigation, death is the appropriate sentence. As defendant is well aware, we have addressed and rejected that argument in *People v. Thompson*, 222 Ill. 2d 1, 52-54 (2006), *People v. Mertz*, 218 Ill. 2d 1, 93-94 (2005), and *People v. Ballard*, 206 Ill. 2d 151, 202-05 (2002). We decline to revisit the issue.

We find in defendant's arguments no basis for reversal or remand. Although defendant has not separately argued that the evidence is insufficient to support his death sentence, it is our responsibility in every death penalty case to consider the appropriateness of the sentence. *People v. Heard*, 187 Ill. 2d 36, 85 (1999). After careful consideration of the evidence adduced, we concur in the jury's determination that death is the appropriate penalty. Pursuant to section 9—1(i) of the Criminal Code (720 ILCS 5/9—1(i) (West 2006)), we find no fundamental injustice in this case.

For the reasons stated herein, we affirm the defendant's conviction and death sentence. We direct the clerk of this court to enter an order setting Tuesday, November 10, 2009, as the date on which the sentence of death shall be carried out. Defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 2006). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden of Tamms Correctional Center, and the warden of the institution where defendant is confined.

*Affirmed.*

Supplemental Opinion Upon Denial of Rehearing

In his petition for rehearing, defendant charges that we "omitted analysis of a key indication of juror bias,

fear of defendant and his wife, arising from Juror A's mistaken belief the defendant learned the jurors' personal information during jury selection." In the argument portion of his original brief on this point, defendant devoted only three sentences to what he now calls this "key indication of juror bias." Although this point was not specifically discussed in our initial disposition, it was not overlooked.

The personal information to which defendant refers was very general, usually limited to the prospective juror's name, the *area* of the county wherein he or she resided, and other information only as considered pertinent to issues that might arise during trial, such as whether the juror would be predisposed in the reception of psychiatric testimony, and whether he or she, or a family member, had been a victim of a crime. At the time of their selection, having disclosed that information, the jurors, knowing that they would be hearing a death penalty case, assured the court and the parties that they could give each side a fair trial. Clearly, the disclosure of information in defendant's presence was not a significant cause for concern at that point or during the guilt/innocence and eligibility phases of the trial—for *anyone* on the jury. Of course, as to that phase of the trial, defendant would have no motive to harm a juror if he were acquitted and no opportunity to do so personally if he were not.

In any case, the event alleged to have caused Juror A concern was the revelation that Charlene Runge had been granted immunity. The jurors did not learn of Charlene Runge's immunity until the aggravation/mitigation phase of sentencing. Whether in fact that was a real concern for Juror A—who was also upset over his loss of income while serving on the jury—we note that he was, according to Juror B, able to joke about Charlene Runge (making up a silly song about her), and he

expressed no fear of defendant himself. In any event, Juror A did not render a verdict in the aggravation/ mitigation phase of the trial—where the immunity was disclosed—so *Juror A's* feelings in that regard—real or feigned—are irrelevant. With respect to the other jurors, we note that none of them expressed concern to the court during the trial, and Juror B did not report any improprieties with respect to them or concerns voiced by them. When questioned after Juror A's departure, all indicated that they would not arrive at any decisions until they had heard all the evidence, listened to arguments of the attorneys, and had been given the law to be applied in the case. Those assurances are not consistent with jurors who were disposed to sentence the defendant to death for their own security, a course of action which would not account for the freedom of Charlene Runge anyway, even assuming *arguendo* there was any modicum of genuine concern. In short, no rational juror would believe that sentencing defendant to death would save him or her from Charlene, but then again, no rational juror would think that Charlene Runge, having cooperated with the police, would have a motive to harm jurors.

We would observe that this court, and the federal court of appeals, in circumstances more compelling than these, have found that no posttrial inquiry into jurors' fears was indicated. In *People v. Whitehead*, 169 Ill. 2d 355 (1996), *overruled in part on other grounds, People v. Coleman*, 183 Ill. 2d 366 (1998), defendant alleged, in a postconviction petition, that he was denied the right to an impartial jury by publication of the jurors' names and addresses in a local newspaper, his theory being that the jurors thereby acquired the incentive to convict defendant because of their fear of him and their desire to conform to prevailing community pressures. *Whitehead*, 169 Ill. 2d at 401. In support of his claim, defendant included, *inter alia*, the affidavits of juror Charlene Joneson, Rose

Marie Bell, the clerk of the circuit court, and Linda Meza, a social psychologist. Joneson stated in her affidavit that jurors were displeased about publication of their names and two complained to the clerk because "[a] person who might be a murderer would have their names and addresses if he were set free." Bell stated that the jury had contacted her as the clerk of the court and complained that their names and addresses had appeared in the local newspaper. Meza stated that with publication of the jurors' names, their privacy and anonymity, which ensures a neutral vote concerning guilt or innocence, was lost. *Whitehead*, 169 Ill. 2d at 401.

On these facts, this court found that defendant had "not demonstrated a substantial violation of constitutional rights." *Whitehead*, 169 Ill. 2d at 401. This court identified the vital question to be determined as "whether the jurors had been influenced and prejudiced to such an extent that they would not, or could not, be fair and impartial." *Whitehead*, 169 Ill. 2d at 401-02. While acknowledging that the publication of jurors' names *and addresses* was bound to have some impact, this court concluded: "We cannot infer *** on this basis that an honest juror would therefore give sway to his emotions and disregard the fundamental requirement of a fair trial and decide to convict a person in order to be absolutely secure." *Whitehead*, 169 Ill. 2d at 402-03.

When the matter subsequently came before the Seventh Circuit Court of Appeals, that court reached the same conclusion. *Whitehead v. Cowan*, 263 F.3d 708 (7th Cir. 2001). The court of appeals, citing *Smith v. Phillips*, 455 U.S. 209, 71 L. Ed. 2d 78, 102 S. Ct. 940 (1982), noted, "the mere fact that the jury was exposed to something which could theoretically affect its vote is not sufficient to require a new trial." *Whitehead*, 263 F.3d at 722. The court observed: "Evidence that the jury was displeased that their anonymity was lost in a murder trial *** is a long way from evidence that jurors were

less than impartial. \*\*\* There is no reasonable possibility that the publication of names and addresses affected the jury's verdict, and this is fatal to Whitehead's claim." *Whitehead*, 263 F.3d at 722. The court concluded there was no duty to investigate under the reasoning of *Remmer*, as "[t]his is not a third-party contact of the sort described in *Remmer*." *Whitehead*, 263 F.3d at 723.

The facts and circumstances of this case present even less cause for concern and inquiry than those at issue in *Whitehead*. The jurors' addresses in *this* case were not disclosed to the defendant or published in a public forum; therefore, neither the defendant nor the public would know where the jurors resided. Thus, the defendant in this case would have no more information about the jurors than the multitude of other defendants in criminal cases prosecuted in this state. The one juror (Juror A) who did express concern—genuine or otherwise—after learning (during sentencing) of the immunity granted to Charlene Runge was dismissed from the jury and did not sign the sentencing verdict. Unlike the situation in *Whitehead*, where the issue arose posttrial, the trial court in this case questioned the remaining jurors after Juror A's dismissal, and their response to the court was consistent with jurors who were willing and able to decide the case on its merits alone. Moreover, as we have noted, the court in this case had the benefit of Juror B's reports, which raised concerns only over Juror A's statements and activities. Finally, we underscore, again, the illogical premises posited by defendant. When the jurors learned of Charlene Runge's immunity, they had already found defendant guilty and eligible for the death penalty. Obviously, he could not have been a threat to them personally, irrespective of the final outcome of deliberations, and Charlene Runge would have been an unlikely threat, given her cooperation with the police.

Given the facts and circumstances of this case, we find that the trial court acted appropriately in this regard

and defendant was sentenced by an impartial jury. Defendant's argument, in his petition for rehearing, does not persuade us to grant rehearing or alter our disposition of this case.

JUSTICE BURKE, dissenting:

I respectfully dissent from the majority decision on the juror misconduct issue. The majority concludes that the trial court committed no error in retaining Juror A for the guilt phase of defendant's trial and finds that the court timely removed Juror A during the sentencing phase. For the reasons below, I do not agree with the first conclusion and would grant defendant a new trial.

On the fifth day of the nine-day guilt phase of defendant's trial, at the conclusion of the State's case in chief, Juror B sent a note to the trial judge expressing concerns about Juror A's conduct, including:

- Juror A cheered loudly in the jury box, saying "yes. Yes, yeah" after the State made some point that disproved a defense theory;
- Juror A checked his cell phone for messages during a break, although the jurors had been instructed not to do so;
- In the jury room that morning, one juror, reviewing her notes from trial, asked whether anyone knew if the term used in testimony was "transferrance" [sic] and Juror A responded in the affirmative; and
- In the jury room that morning, Juror A and at least one other juror were discussing a television show where a mother, her boyfriend, and the babysitter were implicated in the death of a baby, and Juror A "repeated an exact quote" the assistant State's Attorney had made a few days prior. The quote was, the "only thing worse than committing crimes like these would be to implicate an innocent person." The jury had been twice instructed to disregard this comment as it had been stricken.

After receiving the note, the trial court interviewed Juror B. The prosecutor and defense counsel were present. Juror B indicated she was "aghast" by Juror A's cheering and believed this conduct was "horribly inappropriate," particularly since it occurred at a "monumental point" in the case. Juror B thereafter reiterated that Juror A's conduct was "really inappropriate." Juror B was then excused and returned to the jury room.

Following Juror B's interview, defense counsel requested a mistrial. Counsel noted that the jurors were obviously discussing the case before all the evidence had been presented; in fact, before defendant had even begun to present his case. Defense counsel further noted that Juror A, if his mind had not already been made up, certainly was evincing "acute" prejudice toward the defense through his comments and actions. Counsel requested that the trial court dismiss Juror A. The State, in response, argued there was no evidence to show Juror A's mind had been made up and described his conduct as, at most, "bad behavior." The court denied defendant's motion for a mistrial and declined to rule on his request to dismiss Juror A until a later time. The jurors were returned to the courtroom and admonished not to discuss the case. The court did not question Juror A or any other juror regarding Juror A's conduct, nor did the trial court ascertain whether each of the jurors could keep an open mind until the case was submitted to him or her.

The next day, during the testimony of a defense expert, Juror A threw his notebook against the jury box wall. At this time, defense counsel renewed his motion to remove Juror A because he had shown contempt for the defense. The trial judge conducted an *in camera* interview of Juror A. Juror A advised the judge that he was having "some difficulty, but I have my own opinions and things." Juror A further indicated that many of the jurors were frustrated because they could not write down

everything they wanted to. The court then inquired of Juror A:

"THE COURT: Did you formulate any opinion about this case at all, whether or not—

JUROR A: No final opinions because I don't have all the evidence and facts, yet.

THE COURT: I told earlier [*sic*], at the beginning of the case, the defendant is presumed to be innocent of the charge against him.

JUROR A: Absolutely.

THE COURT: You still understand that?

JUROR A: Yes, I do.

THE COURT: Do you have any problem being able to follow that rule of law basically?

JUROR A: No, sir. No.

THE COURT: Okay. Do you have any opinions as to whether or not the defendant's guilty or innocent of the charge against him at the present time?

JUROR A: Not completely, no.

THE COURT: What do you mean by that?

JUROR A: Well, I don't have all the facts.

\* \* \*

THE COURT: Is there anything about what's happened with the trial so far that would in any way prevent you from giving either side in this case a fair trial.

JUROR A: No."

The court dismissed Juror A back to the jury room. Defense counsel again requested that Juror A be excused. The court refused, taking Juror A at his word. The court found that Juror A threw his notes because he was frustrated, which the trial court did not view as unusual. The court did not inquire of any other juror as to how Juror A's conduct may have affected them. Thereafter, the jury returned guilty verdicts against defendant.

Both the United States and Illinois Constitutions guarantee an accused the right to trial by an impartial jury. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, §§ 8, 13; *People v. Strain*, 194 Ill. 2d 467, 475 (2000); see

generally G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 41 (1969). This right "is so basic that a violation of the right requires a reversal[ ] (*Chapman v. California*, 386 U.S. 18; *Tumey v. Ohio*, 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437[ ])" since it "violates even the minimal standards of due process. *Turner v. Louisiana*, 379 U.S. 466, 471-472, 13 L. Ed. 2d 424, 428, 85 S. Ct. 546." *People v. Cole*, 54 Ill. 2d 401, 411 (1973). To be impartial, a juror "*should stand indifferent between the parties.* \*\*\* 'It is essential that every juryman should be wholly free, even from the suspicion of bias, and be *omni exceptione majores* [above all exception].' *Dauncey v. Berkeley*, cited in 3 Chit. Gen. Prac., 795." (Emphasis added.) *Coughlin v. People*, 144 Ill. 140, 163-64 (1893).

The majority acknowledges that a trial by a biased jury deprives a defendant of a fair trial and warrants reversal. Yet, even with the brazen conduct of Juror A, the misconduct of the other jurors in discussing the evidence and stricken comments, and the lack of even minimal inquiry by the trial court to ascertain whether Juror A or the other jurors remained impartial, the majority concludes that the facts support the trial court's determination to allow Juror A to remain on the jury through the guilt and eligibility stages. I do not agree.

The majority first relies on the fact the trial court examined Juror A during *voir dire*, at which time Juror A indicated that he could be fair, that he held no strong beliefs about the death penalty, and that he would consider evidence regarding insanity. I disagree that the *voir dire* questioning can support a finding that the trial court acted properly.

This questioning occurred long before Juror A engaged in misconduct and has no bearing on what ultimately occurred at defendant's trial. The *voir dire* conducted prior to trial is irrelevant to whether Juror A

formed or began to form an opinion during the trial or later became biased against defendant.

Instructive on this question is *People v. Peterson*, 15 Ill. App. 3d 110 (1973). In *Peterson*, after the jury had been sworn, one of the jurors approached defendants' attorney and stated she "was praying that the defendants will plead guilty" so she could go home. *Peterson*, 15 Ill. App. 3d at 110. Defense counsel requested that the court remove the juror. The record discloses there was little discussion of the matter and that the trial court summarily denied defense counsel's request. *Peterson*, 15 Ill. App. 3d at 111. On appeal, the appellate court disagreed with the State's contention that the juror's comment "did not warrant any inquiry on the part of the trial judge to determine the juror's attitude because her impartiality had already been determined during the voir dire." *Peterson*, 15 Ill. App. 3d at 111. Rather, the court concluded that "the remark itself vitiates any previous conclusion made as to impartiality on voir dire, and, without further inquiry, there was no way for the trial court to make a sound judgment on her present state of mind." *Peterson*, 15 Ill. App. 3d at 111.

As in *Peterson*, Juror A's misconduct, not only in cheering in the jury box when the State made a point at a "monumental moment," but also in throwing his notes during the defense expert's testimony, "vitiates any previous conclusion made as to impartiality on voir dire." *Peterson*, 15 Ill. App. 3d at 111. As such, the majority's reliance on *voir dire* questioning is inappropriate in determining whether Juror A remained impartial at defendant's trial.

The majority further relies on the fact that, during the guilt phase of the trial, the judge repeatedly admonished the jurors not to discuss the case before all the evidence was heard. Again, I do not agree that this action was sufficient. The record firmly establishes these

admonishments were ineffective. The jurors did not obey the court's directives but instead discussed the case and evidence throughout the trial. This included a discussion of transference, a term that related to defendant's insanity defense—the core issue at trial—and a portion of the testimony that was stricken from the record. Therefore, I cannot agree that the court's admonitions were sufficient to cure any problem as the majority concludes.

The majority also emphasizes that the determination of juror impartiality rests within the sound discretion of the trial judge: "The applicable standard of review, *after the trial judge has made an appropriate inquiry*, is an abuse of discretion standard \*\*\*." (Emphasis added.) 234 Ill. 2d at 105. There is no question this is a correct statement of the law. However, I do not believe that the record is sufficient to demonstrate the trial judge in the case *sub judice* properly exercised his discretion since there is no evidence that he conducted an "appropriate" inquiry.

In *United States v. Resko*, 3 F.3d 684 (3d Cir. 1993), the Third Circuit emphasized the importance of an adequate record so that a reviewing court would have the means to ascertain the propriety of the trial court's decision. In *Resko*, seven days into the nine-day trial, the district court learned that the members of the jury had been discussing the case during recesses and while waiting in the jury room. *Resko*, 3 F.3d at 687. Defendant's attorneys moved to question each juror individually, but the court denied the request. *Resko*, 3 F.3d at 687. The court also denied defense counsel's motion for a mistrial. *Resko*, 3 F.3d at 688. Rather, the court summoned the jurors, informed them collectively of the problem, and gave them a two-part written questionnaire. The questionnaire asked the jurors: (1) whether he or she had discussed the facts of the case with one or more of the jurors; and (2) if yes, whether, because of those discussions, he or she had formed an opinion about the guilt or

innocence of the defendant. *Resko*, 3 F.3d at 688. Each juror responded in the affirmative to the first question and in the negative to the second. The district court investigated no further. Thereafter, the jury returned guilty verdicts against both of the defendants. *Resko*, 3 F.3d at 688. On appeal, the Third Circuit found that it simply had an insufficient record upon which to evaluate any potential prejudice to the defendants. The court concluded that "in the circumstances here, in which there is unequivocal proof of jury misconduct discovered mid-trial coupled with a failure by the district court to evaluate the nature of the jury misconduct or the existence of prejudice, \*\*\* a new trial is warranted." *Resko*, 3 F.3d at 694.

The *Resko* court found that the method utilized by the district court was inadequate to fulfill its responsibility of determining whether the defendants suffered any prejudice from the jury's misconduct. *Resko*, 3 F.3d at 691. The court concluded that the district court should have engaged in further inquiry, such as individualized questioning, to determine whether the jurors maintained open minds. *Resko*, 3 F.3d at 691. Even though every juror admitted to premature discussions, the district court failed to engage in any additional investigation beyond the cursory questionnaire. Because of this, "there [wa]s no evidence in the record one way or the other regarding prejudice to the defendants." *Resko*, 3 F.3d at 690. Specifically, without further inquiry by the district court, the reviewing court had "no way to know the nature of the jurors' discussions and whether these discussions in fact resulted in prejudice to the defendants." *Resko*, 3 F.3d at 690. Moreover, "the absence of information and the consequent inability of the district court meaningfully to assess the nature and extent of the jurors' premature discussions in order to ascertain whether there ha[d] been any prejudice to the defendants

create[d] a highly problematic situation." *Resko*, 3 F.3d at 690. The *Resko* court noted that "[a] trial judge does not possess talismanic powers." Therefore, in the absence of any effort to evaluate the effect of the juror misconduct, "the judge can only guess as to the existence or non-existence of prejudice." *Resko*, 3 F.3d at 694. Likewise, in the absence of any record, a reviewing court is similarly left to speculate whether the district court acted properly. *Resko*, 3 F.3d at 694; accord *United States v. Bertoli*, 40 F.3d 1384, 1396 (3d Cir. 1994) (distinguishing *Resko* on its facts but holding, in reliance on *Resko*, that a reviewing court must satisfy itself that the trial court engaged in a meaningful assessment of whether there was any prejudice to defendant, and that when a trial court fails to conduct a meaningful assessment, a reviewing court cannot evaluate its conduct and, thus, remand for a new trial is proper).

In *United States v. McClinton*, 135 F.3d 1178 (7th Cir. 1998), two jurors were overheard by other jurors making potentially racist comments, which also appeared to indicate that at least one of the jurors had prejudged the defendants' guilt. *McClinton*, 135 F.3d at 1185. When one of the defendants moved for a mistrial, the district court questioned each of the jurors individually, asking, "whether they had any personal knowledge of the conversation, heard any other statements of this sort, shared any of these beliefs about African-Americans, or had any bias or prejudice toward African-Americans." *McClinton*, 135 F.3d at 1185. The court further inquired of each juror, whether "the statements influenced the jurors in any way; whether they could keep an open mind about the defendants' guilt or innocence; and whether they could not be impartial for any reason." *McClinton*, 135 F.3d at 1185. Not only did the district court judge question each juror individually and in detail, she also allowed the attorneys to question the jurors. In the course

of this questioning, the district court judge was able to determine which jurors had made inappropriate comments and the exact nature of the comments. *McClinton*, 135 F.3d at 1185. After doing so, the court excused one of the jurors and admonished the rest regarding the importance of keeping an open mind. On appeal, the Seventh Circuit noted that "[t]he tool for examining an intrinsic influence like juror bias \*\*\* is a voir dire." *McClinton*, 135 F.3d at 1186. The court then held that the district court's handling of the matter and the decision to question individual jurors was "a reasonable response to a difficult situation" and, therefore, was not an abuse of discretion. *McClinton*, 135 F.3d at 1188.

In *United States v. Vasquez-Ruiz*, 502 F.3d 700 (7th Cir. 2007), the Seventh Circuit was again faced with the problem of juror misconduct. Interpreting *McClinton*, the *Vasquez-Ruiz* court noted: "The broader point here [in *McClinton*'s holding] is that the district court's actions resulted in the development of a record that enabled both that court and this one to evaluate the degree of prejudice that had developed, and to come to a reasoned conclusion on the question whether the curative steps were adequate." *Vasquez-Ruiz*, 502 F.3d at 706. In *Vasquez-Ruiz*, however, the court found the record was "too sparse" and lacked information. Therefore, the reviewing court could not conclude there was no prejudice to the defendants from juror misconduct. *Vasquez-Ruiz*, 502 F.3d at 707.

The unifying principle in these cases is that, once it is established there has been jury misconduct, the trial court must make an adequate record. In the absence of an adequate record, the reviewing court cannot make an intelligent review of the trial court's conduct.

Applying these principles to the case at bar, the trial judge should have interviewed Juror A after the court learned that he cheered in the jury box. The majority

acknowledges that Juror A's "cheering" for the prosecution "would have suggested that Juror A had a biased view of the case." 234 Ill. 2d at 121. Nevertheless, the majority fails to explain, let alone address, why the trial court need not have questioned Juror A at that juncture regarding his "cheering." In my view, the trial court should have ascertained exactly what Juror A was cheering about and why. Only in this way could the court determine whether Juror A remained impartial or whether he was in fact biased against defendant. Since we have no record from which to conclude that Juror A remained impartial at this time and because his conduct points to the contrary, I would find that the trial court erred when it refused defense counsel's request that Juror A be dismissed.

I additionally believe that the trial judge also should have inquired of Juror B whether Juror A's cheering influenced her in any way. This is especially true in light of the fact she admitted to the court she was "aghast" by Juror A's conduct and believed it "horribly" and "really" inappropriate. Instead of ascertaining the effect Juror A had on Juror B, the trial court simply sent Juror B back to the jury room. Lastly, I believe that when the court received Juror B's note and became aware of the misconduct of Juror A and others, the judge had a responsibility to inquire of all of the jurors whether Juror A's misconduct had any effect on their opinions or beliefs in the case.

The trial court failed to engage in any investigation after Juror B reported misconduct by Juror A and other jurors. Thus, the trial court possessed no ability to meaningfully assess the situation. There is simply no way to know whether Juror A's cheering or the premature discussions of the evidence influenced any of the jurors to the extent that they were no longer impartial. The trial court had no means to evaluate the jurors'

demeanor or credibility in making a finding regarding a historical fact, *i.e.*, whether or not each juror retained an open mind. Accordingly, the record here is entirely inadequate for us to determine whether the trial court properly exercised its discretion.

The facts of the case *sub judice* are akin to *Resko* and *Vasquez-Ruiz*. Here, we have unequivocal proof of juror misconduct, yet the trial judge did nothing to make an adequate record from which it could make a reasoned decision about the jurors' continued impartiality. Accordingly, we too can only speculate.

It is true that the trial judge did question Juror A following the "note throwing incident." Regarding this event, the majority states:

> "We would observe that Juror A must have realized at th[is] juncture that certain negative answers to the court's questions would likely have gotten him off the jury and returned him to gainful employment if that was his desire. Yet, he did not follow that course. *His diligence in trying to take notes during the defendant's case seems to confirm his response to the court that he had formed 'no final opinions.' If he had, what would be the point of taking notes?*" (Emphasis added.) 234 Ill. 2d at 121-22.

I respectfully submit that the majority is engaging in pure speculation here. One could just as easily conclude that Juror A desired to remain on the jury because he had developed a bias against defendant and wanted to stay on the jury to convict him. It is possible that Juror A took notes in order to better sway the other jurors to his biased view. As the court in *Resko* stated, "once a juror expresses his or her views in the presence of other jurors, he or she is likely to continue to adhere to that opinion and to pay greater attention to evidence presented that comports with that opinion." *Resko*, 3 F.3d at 689. Moreover, one could also argue that the evidence tends to support this alternative conclusion since the record shows that the jurors were discussing transfer-

ence and were talking about evidence they were instructed to disregard.

Despite the inadequacy of the record, the majority concludes that there are insufficient facts and circumstances to overturn the trial court's determination that Juror A was qualified to serve. In support of its conclusion, the majority relies upon *United States v. Harris*, 908 F.2d 728 (11th Cir. 1990), and *Davis v. Woodford*, 384 F.3d 628 (9th Cir. 2004).

With respect to *Harris*, the majority finds:

"We believe Juror B's report of Juror A's 'cheering' is *at least* as ambiguous, as to intent and context, as the remark attributed to the juror in *Harris*. Significantly, Juror B reported that Juror A was 'cheering out loud vocally' when 'the prosecution had made some points.' If that were true, the parties and the trial judge would have heard it *if they were in the courtroom*. At one point during her report, Juror B told the trial court, 'I think you had gone back to have a discussion, maybe came back out. I can't remember exactly when it was.' Of course, if the parties and the trial judge were out of the courtroom, the 'cheering' could hardly have occurred contemporaneously with 'a monumental point' in the prosecution's cross-examination, as Juror B represented." (Emphases in original.) 234 Ill. 2d at 123.

Juror A's "cheering" would not be ambiguous, either in intent or context, if the trial court had simply questioned Juror A about it. Moreover, the majority's comments regarding the timing of the cheering are again speculative. Had the trial court inquired of Juror A, we would know precisely when the comment was made and whether it was truly a "monumental" point of the State's case.

Moreover, *Harris* is not persuasive authority. In *Harris*, in addition to finding the comment ambiguous, the Eleventh Circuit noted that the district court refused to investigate the juror's remark because "after several

weeks of trial the jurors would naturally begin to form an opinion of the case." *Harris*, 908 F.2d at 734. In finding this to be a valid rationale, the Eleventh Circuit relied upon *Grooms v. Wainwright*, 610 F.2d 344 (5th Cir. 1980), where the court found no abuse of discretion when the district court denied a motion for a new trial after a juror remarked that " 'as far as I'm concerned, [from] what I heard already he's [the defendant's] guilty.' " *Grooms*, 610 F.2d at 346. The *Grooms* court reasoned that the comment, which was made at the end of the prosecution's case but before the defense presented any evidence, "does not reflect serious prejudice, but only an objective evaluation of the evidence presented to date in the trial." *Grooms*, 610 F.2d at 348.

The *Grooms* court cited no authority for this proposition, which is contrary to the principles of jury deliberation and defies common sense. Jurors are *not* supposed to evaluate evidence and form an opinion on the merits of the case until *all* the evidence has been heard, they have been properly instructed by the court, and they assemble as a group for deliberation. This is so because, "once a juror expresses his or her views in the presence of other jurors, he or she is likely to continue to adhere to that opinion." *Resko*, 3 F.3d at 689. The *Grooms* decision is poorly reasoned and, in my view, warrants rejecting *Harris* as persuasive authority.

I also believe the majority's reliance on *Davis* is misplaced. Unlike the case at bar, *Davis* did not involve any allegation of juror misconduct. Rather, at issue in *Davis* was whether a juror's note asking questions about the death penalty indicated juror bias. *Davis*, 384 F.3d at 652-53. Accordingly, the *Davis* court did not engage in any analysis regarding juror misconduct, the relevant question here.

Further, I disagree with the majority's statement that there was "even less evidence of juror bias" here "than

that extant in *Davis*." 234 Ill. 2d at 126. In *Davis*, one juror sent a note to the trial judge and there was no evidence the other jurors were even aware of it. Here, however, we have two instances of misconduct on the part of Juror A, of which other jurors were clearly aware, and instances of misconduct by other jurors as well. Moreover, I do not agree with the majority's statement that only Juror A's impartiality was "ever really in question." 234 Ill. 2d at 126. Again, other jurors engaged in misconduct, yet were never interviewed. It is pure speculation as to whether they remained impartial. Thus, while the majority concludes that it "appears" (234 Ill. 2d at 126) the trial judge acted appropriately, I do not believe the record is sufficient for us to make that determination.

Addressing the question of whether the impartiality of other jurors was adversely affected by Juror A's misconduct, the majority finds that because Juror B, the foreperson, was "*extremely* diligent" in reporting Juror A's improprieties, and her concerns centered only on Juror A, "[i]t is a reasonable inference that she would have reported others had she believed there was a need to do so." 234 Ill. 2d at 127.

Again, this is pure speculation on the part of the majority. I note that Juror B was hesitant to bring these matters to the attention of the trial judge and that she did not want the other jurors to know she was reporting the misconduct. Thus, one could just as easily conclude that Juror B turned a blind eye to other problems or failed to report them because she was concerned the rest of the jury would perceive her as a "troublemaker." After all, Juror B stated that Juror A was popular and well-liked on the panel, that he was "really nice," "very witty," "very clever," and "keeps morale going well." According to Juror B, "everyone really really like[d] [Juror A]."

Moreover, the majority's speculation assumes Juror B witnessed all instances of misconduct. However, given the length of the trial, Juror B may not have been privy to all misconduct. Similarly, even if Juror B was "diligent," her diligence was not necessarily shared by the other jurors. Lastly, Juror A was not the only jury member who engaged in some of the misconduct Juror B reported. The other jurors' misconduct demonstrates that they did not follow the court's directives and instructions, but rather ignored them and violated them. Therefore, it cannot be presumed from Juror B's "diligence" that the other jurors remained impartial. In any event, the majority's speculation and assumption would be unnecessary had the trial court granted defense counsel's requests and questioned each juror individually.

In support of its conclusion that the trial court's actions in this case were "appropriate and sufficient" (234 Ill. 2d at 129), the majority comments that courts tend to "minimize the impact that one juror's views may have on others." 234 Ill. 2d at 129. The majority relies on *United States v. Yeje-Cabrera*, 430 F.3d 1 (1st Cir. 2005), and *United States v. Paneras*, 222 F.3d 406 (7th Cir. 2000), to support this rationale. Neither case is persuasive here.

In *Yeje-Cabrera*, a juror sent a note to the district court judge stating her belief that the defendants should be cross-examined. There was no evidence she expressed this view to other jurors or that they were aware of the note. Thereafter, the district court strongly admonished the jurors regarding the burden of proof and the fact they were not to discuss the case. The court further instructed the jurors that if each could not follow these instructions, he or she was to speak to the clerk. The court then polled the jury as a whole, asking for a show of hands as to whether any had discussed the case. No

hands were raised. Thereafter, the only juror to contact the clerk and court was the sender of the note, who was dismissed. Importantly, there was no contact between the sender of the note and the rest of the members of the jury between the time the jury panel was admonished and the sender of the note was dismissed.

*Yeje-Cabrera* is clearly distinguishable from the case at bar. First, the note in *Yeje-Cabrera* did not demonstrate bias, while Juror A's conduct in this case did. Moreover, unlike *Yeje-Cabrera*, there is no question in this case that other jurors were exposed to and were aware of Juror A's conduct. Further, in *Yeje-Cabrera* the court observed that, "[e]ven if the one juror had communicated her views to the other jurors, there is also no reason to think those jurors were dissuaded from following the instructions of the judge." *Yeje-Cabrera*, 430 F.3d at 11. Here, in contrast, the record clearly discloses that other jurors did *not* follow the court's instructions or directives. Finally, and perhaps most important, unlike *Yeje-Cabrera*, the jurors in this case were not admonished following the cheering incident or the note-throwing incident in *any* manner, let alone told that if they had any sort of problem, they should contact the clerk or the court. Thus, *Yeje-Cabrera* simply does not support the conclusion that the trial judge did not err in this case.

*Paneras* is similarly inapposite. In *Paneras*, the juror, a professional artist, drew a humorous depiction of the defendant's acts as described during the trial. The district court found that the conduct was "fairly benign." *Paneras*, 222 F.3d at 411. Here, in contrast, Juror A's conduct in cheering and throwing his notes in the jury box during the course of trial cannot, in any sense, be described as "benign." Moreover, the challenged conduct in *Paneras* occurred during jury deliberation, the time when the jurors should be discussing the case, expressing their views, and reaching a decision. In this case, the

conduct occurred during the course of defendant's trial, when jurors should not express any views or have formed any opinion. Accordingly, *Paneras* does not support a finding that the trial court's inaction in this case was appropriate.

The majority further relies on the collective questioning of jurors, and the trial court's reminder to them that they were not to arrive at any conclusions before all the evidence was heard. When asked whether they could still comply with this directive, the jury responded in the affirmative. The majority states, "We have no reason to believe that they lied to the trial court when they made this affirmation," and concludes that "under the circumstances, we cannot say that the trial court erred in not conducting a more extensive inquiry or questioning jurors individually before proceeding." 234 Ill. 2d at 131.

I find this reasoning to be faulty. First and most importantly, this questioning occurred during the *sentencing* phase, not during the *trial*. During the guilt phase, the trial court never inquired collectively, let alone individually, as to whether the jurors could comply with this directive or whether they remained impartial. Whether the jurors could comply with this directive at sentencing, after already convicting defendant, is irrelevant to whether they remained impartial during the *guilt* phase.

Moreover, through this collective admonishment, the circuit court allowed the jurors to decide their own impartiality. This is improper. "It has been held that jurors themselves are incapable of knowing the effect which prejudicial matters might have upon their unconscious minds." *People v. Hryciuk*, 5 Ill. 2d 176, 184 (1954). Again, I do not believe reliance on this belated collective questioning is appropriate to support a finding that the trial court acted properly.

The majority acknowledges that a trial judge has a

duty under the law to be " 'ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen.' " 234 Ill. 2d at 103, quoting *Smith v. Phillips*, 455 U.S. 209, 217, 71 L. Ed. 2d 78, 86, 102 S. Ct. 940, 946 (1982). This is particularly true in a capital case. See *People v. Thompson*, 222 Ill. 2d 1, 35 (2006) (because of the seriousness of a capital case, the record should be subject to "intense scrutiny"). See also *Baze v. Rees*, 553 U.S. 35, 84, 170 L. Ed. 2d 420, 453, 128 S. Ct. 1520, 1550 (2008) (Stevens, J., concurring) ("risk of error in capital cases may be greater than in other cases because the facts are often so disturbing").

Yet here, where there was obvious misconduct by Juror A *and* other jurors in a *capital* case, the trial judge did nothing to determine what effect Juror A's misconduct had on the other jurors, nor did it ascertain whether *all* the jurors remained impartial during the guilt phase. It is the failure to inquire, in my mind, that constitutes reversible error and warrants a new trial. I do not agree with the majority's conclusion that "defendant received 'precisely what due process required: a fair trial before an impartial and properly instructed jury.' " 234 Ill. 2d at 131, quoting *Rivera v. Illinois*, 556 U.S. at 162, 173 L. Ed. 2d at 331-32, 129 S. Ct. at 1456. Because of the trial judge's failure to question the members of the jury, there are insufficient facts from which to make this determination.

I recognize that the crimes at issue here, described in lengthy detail by the majority, were horrific. But it is precisely these types of cases that test our commitment to the principle of law. We must not allow ourselves to be swayed by emotion. Given Illinois' past history with capital cases, the majority's opinion sends the wrong message about how these cases will be treated in Illinois.

Because I believe defendant is entitled to a new trial, I need not address, or render any findings, regarding the

misconduct that occurred during the sentencing phase and whether the trial court timely dismissed Juror A.

JUSTICES FREEMAN and KILBRIDE join in this dissent.